[L. A. No. 4993. In Bank.—June 1, 1920.]

## TITLE INSURANCE AND TRUST COMPANY (a Corporation), Respondent, v. MILLER & LUX, INCORPORATED, (a Corporation), et al., Appellants.

[L. A. No. 4994. In Bank.—June 1, 1920.]

## TITLE INSURANCE AND TRUST COMPANY (a Corporation), Appellant, v. MILLER & LUX, INCORPORATED (a Corporation), et al., Respondents.

[1] WATER AND WATER RIGHTS—LUX-HAGGIN CONTRACT OF 1888—USE OF WATERS OF KERN RIVER ON NONRIPARIAN LANDS.—In this action to quiet title to certain proportions of the waters of Kern River against the claims of defendants and which involved the "Lux-Haggin contract" or "Water Settlement Agreement" of July 28, 1888, the evidence is held sufficient to sustain the conclusion of the trial court that the plaintiff, as the successor in interest of one of the parties to the agreement, was entitled to take 9.94 per cent of the waters allotted to the first parties thereby, including the waters accumulated by them in Buena Vista reservoir, and to use the same at any place it should think proper either on lands riparian to the river or its branches or on other nonriparian lands, but that the use should be limited to lands owned by plaintiff's predecessor on the date of the agreement.

[2] ID.—AGREEMENT BETWEEN RIPARIAN OWNERS—FAILURE TO DESCRIBE LANDS—RIGHTS NOT ESTABLISHED.—An agreement between riparian owners not describing any land but merely showing the area signed for by the several parties establishes no riparian rights of the parties thereto in any land, being too uncertain, as such rights can exist only as part and parcel of specific tracts, and any contract relating thereto is of no avail unless it describes or refers to the land in a manner sufficient for identification.

[3] ID.—LANDS ENTITLED TO RIPARIAN RIGHTS.—Only tracts which are acquired by a single conveyance from the state and which abut upon a stream are entitled to riparian rights.

[4] ID.—LUX-HAGGIN CONTRACT—USE OF WATER ON LANDS OWNED AT DATE OF CONTRACT.—In this action the court erred in adjudging to the plaintiff the unlimited right to use the water at any place it should think proper, as its use should have been restricted to lands owned by plaintiff's predecessor on the date of the water settlement agreement of 1888.

[5] ID.—RIGHT OF RIPARIAN OWNER AGAINST APPROPRIATOR.—The right of each riparian proprietor as against appropriators extends to the entire stream, although only a small part of the land of each actually abuts on the stream.

[6] ID.—QUIETING TITLE—CLAIM OF LIEN BY DEFENDANT—PLEADING— AMENDMENT OF ANSWER.—Where in an action to quiet title to certain water rights and certain lands against the alleged unfounded claims of the defendants one of the defendants claimed that such rights as plaintiff had were part and parcel of plaintiff's lands, either as a riparian right, or as an appurtenance thereto, it was proper to allow such defendant, if it had a claim, present or prospective, against the plaintiff, which would constitute a lien upon the lands, to assert the same by amendment of its answer and have the lien established in the action.

[7] PLEADING—AMENDMENTS DURING TRIAL—DISCRETION.—The matter of amending pleadings during the trial is largely in the discretion of the trial court.

[8] ESTATES OF DECEASED PERSONS — DECREE OF DISTRIBUTION — DECLARATION OF LIEN UPON LAND—EFFECT OF.—A lien or burden upon land declared in a decree of distribution and that it should run with and bind the land establishes the lien and is binding upon the distributees and their successor of title.

[9] ID. — LIEN UPON DISTRIBUTED PROPERTY — POWER OF PROBATE COURT.—The court in probate has power in distributing the estate of a decedent, to declare a lien thereon in favor of a third person and that the distributee snall hold it subject to such lien.

[10] ID.—UNCERTAINTY AS TO AMOUNT OF LIEN—EFFECT OF.—A decree of distribution declaring a lien on land in favor of a corporation which had a contingent claim against the estate for expenses to be incurred in certain water litigation is not void for uncertainty on the ground that the amount of the expenses was left by the decree for the determination of the corporation.

3. What is riparian land, notes, 9 Ann. Cas. 1235; Ann. Cas. 1913E, 709; 11 L. R. A. (N. S.) 1062.

APPEALS from a judgment of the Superior Court of Kern County. Milton T. Farmer, Judge. Modified and affirmed.

The facts are stated in the opinion of the court.

Edward F. Treadwell, McCutchen, Olney & Willard, and McCutchen, Willard, Mannon & Greene, for Appellants, in L. A. No. 4993, and for Respondents in L. A. No. 4994.

Hunsaker, Britt & Edwards and Hunsaker, Britt & Cosgrove for Respondent in L. A. No. 4993 and for Appellant in L. A. No. 4994.

## Case No. 4993.

SHAW, J.—The defendants, Miller & Lux, Incorporated, and Kern County Land Company, separately, appeal from portions of the judgment. They also respectively appeal from the order of the court denying motions to vacate the judgment and enter a different judgment on the findings and from the order of the court denying motions for a new trial. All the appeals are presented in one transcript of the record.

The complaint alleges that the plaintiff is the owner of a certain proportion of the waters of Kern River; that the defendants each claim interests or rights in the waters belonging to plaintiff; that the claims of the defendants are without right and that none of the defendants has any interest therein. The prayer is that the plainiff be declared to be the owner of said proportion of said waters, that its title thereto be quieted against the claims of the defendants thereto, and that the plaintiff be declared entitled "to use and dispose of its share of said waters as aforesaid in any manner, at any place and for any purpose it may think proper." The judgment was in accordance with this prayer.

The claim of appellants is that plaintiff's right to use the water is a riparian right appurtenant to certain lands, that it has no right to use it on other lands, and that its use is subject to the reasonable use of other riparian owners along the stream, including the appellants. The question whether the water right of the plaintiff is that of a riparian owner only, or is a right arising out of contract or appropriation,

depends on transactions and conduct during a period extending from 1879 to 1911, and it will be necessary to give as briefly as possible a history of the origin of the right and of the subsequent transactions throwing light upon its nature and character.

Kern River emerges from the foothills into the valley about four miles northeast of Bakersfield. From thence it now runs northerly of Bakersfield about twenty miles to the lower part of the valley and there turns and flows northwest and north some thirty miles or more to Tulare Lake. It has in the course of years changed its course from time to time. The water in times of flood will spread out of the regular channel and find its way in part through the sloughs or old channels. Formerly the main channel turned to the south shortly after emerging from the foothills and ran easterly of Bakersfield nearly south to Kern Lake, thence westerly to Buena Vista Lake and on to Tulare Lake. In high floods it now divides near Buena Vista Lake, part of the water flowing into that lake and another part running down Buena Vista Slough toward Tulare Lake. We speak, of course, of conditions as they would have been but for the changes which have been made by the several parties interested to control the course of the water. The interests of the several parties in the land involved in this action were acquired by them prior to the year 1879. Haggin, Tevis, Carr, and others had acquired large tracts of land, apparently, for the most part, not riparian to the stream, but which were irrigable by means of canals from Kern River, and they had made canals and thereby diverted a large part of the water of the river and were applying the same to the irrigation of lands situated in the vicinity of Bakersfield and south, southwest, and northerly thereof. Miller & Lux, Frederick Cox, C. W. Clarke, Reddington, Livermore, Cornwell, Bonestell, and Stebbins had acquired large tracts farther down the valley to which the water of the river, at least in times of flood, naturally would flow, if not intercepted. The diversions by Haggin and the others had the effect of preventing this flow. Thereupon Miller & Lux and others, on May 12, 1879, began the historic action of *Lux* v. *Haggin,* the decision of which by the supreme court is found in volume 69 of California Reports, extending from page 264 to page 439, [4 Pac. 919, 10 Pac. 674]. Its object was

to enjoin the diversions above mentioned, and it was based on the claim that the lands of the plaintiffs were riparian to the river or its branches and sloughs and that the diversions of the defendants were invasions of the riparian rights of the plaintiffs in the waters naturally flowing therein. The opinion in the case clearly shows that the principal question for decision was whether the right of a riparian owner, or that of an appropriator or mere diverter, was the superior right to the waters of the stream, under the law of California. On November 3, 1879, the plaintiffs therein, together with the said Frederick Cox and C. W. Clarke, executed an agreement relating to the prosecution of said action.

This agreement recited that the parties thereto, "being owners of land in Kern County, California, on and adjacent to Kern Lake, Buena Vista Lake, the slough connecting said lakes, and on Buena Vista Slough, all of which said lands have a common interest in the assertion, preservation, and maintenance of the 'Riparian Rights' of the said land derived by the water of Kern River through and by Kern Lake, Buena Vista Lake and Buena Vista Slough, and whereas the said riparian rights are threatened and in danger by the diversion of the waters of Kern River by sundry adverse claiming parties who are illegally diverting the said waters and preventing their natural and heretofore continuous flow through the above described channels and the lands of the parties subscribing hereto; and whereas such damaging, and illegal diversion can best be met by united action in litigation of all the parties in interest for the establishment and maintenance of the riparian rights of the hereinbefore mentioned land.

"Now, therefore, the said parties do hereby associate themselves together for the prosecution of such litigation and do pledge themselves each to the other that they will share all proper expenses of such litigation in the proportion of the number of acres of land set opposite to their respective signatures hereto, and that the association shall continue to exist until the final termination of all litigation necessary to establish the riparian rights of the said lands, it being expressly stipulated that should any party or parties during the pendency of such litigation sell his or their lands or any portion thereof, he or they shall nevertheless pay his

or their pro rata of cost of such litigation to the final end thereof, notwithstanding any such sale during the pendency thereof.'' The parties signed this agreement and each wrote the number of acres claimed by him opposite his name, as follows:

| | |
|---|---|
| Clarke & Cox | 14,520 acres |
| Miller & Lux | 36,644 " |
| John H. Reddington | 13,283 " |
| George N. Cornwell | 8,000 ". |
| L. H. Bonestell | 1,920 " |
| Horatio B. Livermore | 22,541 " |
| Horatio Stebbins | 1,280 " |

The total number of acres was 98,188.

Thereafter the said action was prosecuted in the superior court and judgment was rendered therein in favor of the defendants. The appeal was taken by the plaintiffs and the final decision was made as above stated. The case attracted a great deal of attention throughout the state, and it is a matter of history that it was made an issue in the political campaigns of 1884 and 1886, and was a subject of agitation at the legislative sessions of 1885 and 1887, as a result of which section 1422 of the Civil Code, declaring that ''the rights of riparian proprietors are not affected by the provisions of this title,'' was repealed by the legislature of 1887, [Stats. 1887, p. 114]. The judgment of the supreme court reversed the judgment of the court below and remanded the cause for a new trial. The opinion, however, settled the controversy between the parties as to the superiority of riparian rights in favor of the plaintiffs in the action, and the cause was not tried again. Reddington, Livermore, and Bonestell had in the meantime conveyed their lands to Miller & Lux. Instead of having a new trial, the parties settled their controversy by an elaborate contract executed on July 28, 1888, and known in that region as the ''Lux-Haggin contract,'' or as the ''Water Settlement Agreement.'' It was signed by a large number of persons who were not parties to the action. The parties to this agreement designated as parties of the first part included all the persons who signed the agreement of November 3, 1879, except those who had sold their interests to some of the other parties thereto as aforesaid, and also the Kern Valley Water Company, a corporation which operated a

canal to take water to the lands of said parties, or some of them, and which was apparently a mere agency for the use by them of the riparian rights or waters claimed by them. The parties of the second part were composed of two classes: First, corporations operating canals for the diversion and distribution of the waters of the river to others, under rights by appropriation; second, persons claiming rights to receive such waters from said corporations for use on their respective tracts of land. The agreement recited that the several parties executing it either claimed to own lands along the river and its branches, with riparian rights in the water, or other lands irrigated or susceptible of irrigation from water of said river, or claimed rights to divert water from the river and distribute and sell the same for the irrigation of lands not riparian to the river. One recital is as follows: "All of the aforesaid owners of and claimants in said lands claim to have in connection with or as appurtenant to, or as a part and parcel of said lands, certain riparian or other rights to the waters of said river, sloughs or lakes, or some thereof." The parties holding or claiming rights by appropriation took their water from the river at points above the lands claimed by the parties of the first part and above the head of the canal of the Kern Valley Water Company. The agreement provided that the water of the river should be measured at two places; one at a point where the river debouches from the foothills, called "the first point of measurement," a short distance above the headgate of the Kern Island Irrigating Canal Company; the other, designated as "the second point of measurement," located in the river some twenty miles or more farther down the stream and below the intakes of all ditches owned by any of the parties of the second part. Of the water found to be at the first point of measurement three hundred cubic feet per second was to be delivered to the Kern Island Irrigating Canal Company. Of the balance, one-third was allotted to the so-called parties of the first part and two-thirds was allotted to the parties of the second part. The one-third to go to the first parties was to be delivered without diminution at the second point of measurement. This division was to continue during the irrigating season, that is, from March 1st to August 31st of each year. During the remaining months the second parties

were to have all the water not taken by said Kern Island
Irrigating Canal Company to use as they saw fit, but what-
ever they suffered to flow down through the second point of
measurement was to go to the parties of the first part.
The instrument declares that the shares of water thus
allotted to the parties of the first part were "to be used
and disposed of by them in any manner, at any place and
for any purpose they may think proper, or arrange or agree
among themselves." The same language was used with
reference to the rights of the parties of the second part
in the waters allotted to them by the agreement, and the
three hundred cubic feet of said Kern Island Irrigating
Canal Company was also "to be used and disposed of in
any manner, at any place and for any purpose it should
think proper." The agreement also provided that for the
benefit of the parties of the first part levees should be con-
structed around a large lake known as Buena Vista Lake,
into which a part of the water of the Kern River naturally
ran, so as to make of said lake to some extent an artificial
reservoir in which should be confined the waters of the river
flowing at the second point, at times when there was more
than was then in use by the first parties, to be there stored
for use subsequently by the parties of the first part. The
expense of constructing the levees and other works necessary
for conducting the water in and out of the reservoir and
for controlling the flow was to be paid, one-half by the first
parties and one-half by the second parties. A part of such
expenses of maintaining such levees, canals, and other
works, after the construction thereof, were, however, to be
borne by the parties of the first part. The agreement
(paragraph 17) declared that it should be perpetual and
should be construed "as a covenant running with all the
land owned or claimed by any of the parties hereto which
is situated in the following townships or portions of town-
ships," here describing thirty congressional townships and
portions of others, extending from township 25, on the
north, to township 32, on the south, and from range 22 on
the west, to range 28 on the east, embracing a large part of
the valley land of Kern County. It also declared that
the parties of the first part "do hereby grant and convey
unto said parties of the second part" all the waters and
water rights to which the second parties were declared

to be entitled thereby and that in like manner the parties of the second part "do hereby grant and convey unto the said parties of the first part . . . all and singular the waters, water rights, privileges and easements, to which said parties of the first part are respectively, by paragraph third of this instrument, declared entitled, or which are or are intended to be, by said paragraph apportioned to them respectively." The waters to which the first parties were declared to be entitled by said third paragraph of the instrument was the one-third of the water flowing at the first point of measurement and delivered at the second point of measurement as above stated, together with the surplus waters allowed to run by the second point of measurement during the six months following each irrigating season, as above stated. Paragraph third further declares that the second parties each "hereby acknowledges the right of the parties of the first part as riparian proprietors in Kern River, Buena Vista Slough, Kern and Buena Vista Lakes, and the slough connecting said lakes, to the proportion of the water flowing in Kern River, hereinbefore agreed upon, and that as such riparian proprietors they shall, at all times, be entitled to receive at the second point of measurement during the months of March, April, May, June, July, and August, of each year, the amount of water they are so entitled to." It also provided that Henry Miller should act as the agent for the first parties in the construction of the reservoir. The evidence shows that by common consent, after the execution of the agreement of 1888, Henry Miller acted as the manager and agent of said first parties in the affairs of common interest connected with their water rights under said agreement, until after the commencement of the present action.

In 1879, Miller & Lux were partners and the property in controversy, so far as Miller & Lux were concerned, was the property of said firm. Lux afterward died and the affairs of the firm were managed by Henry Miller, as surviving partner, until the settlement of the estate of Lux. In that settlement a corporation was formed under the name of "Miller & Lux" and the property of the firm was transferred to said corporation, which thereafter operated under the management of Miller. In our further discussion we shall use the name, Miller & Lux, to designate all that

was done either by Miller personally or by Miller & Lux in the management of the common affairs of the first parties to said agreement of 1888.

The record does not show that any express agreement was ever made between said parties of the first part defining their respective shares or proportions of the waters allotted to them by said water settlement agreement of 1888. Nor was there any agreement between them expressly declaring the nature or origin of the water rights claimed by the first parties, except as it is to be found in the aforesaid agreements of November 3, 1879, and July 28, 1888. The appellants claim that these agreements, when considered in connection with the matter in controversy in *Lux* v. *Haggin,* to which they referred, together with the subsequent conduct of the parties interested in the 98,188 acres of land referred to in the agreement of 1879, and the contents of other instruments of writing to which Cox was a party, conclusively establish the fact that the water rights secured by the parties of the first part in the water settlement agreement of 1888, and now in controversy, were riparian rights possessed by the parties, respectively, solely by virtue of the ownership of portions of the 98,188 acres of land, and pertaining only to those lands. They also claim that, even if the rights are not riparian in character, the evidence conclusively shows that the respective water rights of said parties so obtained are rights appurtenant to said 98,188 acres of land, and none other, and that none of the first parties or their successors in interest can rightfully apply the same to other lands without the consent of the others.

The respondent insists that from the several contracts made by the parties, together with other evidence, there arises a necessary implication, or at least a reasonable inference, that the parties of the first part in said water settlement agreement of 1888 are each entitled to a share in the water allotted to them by that agreement in the same proportion as he was called on to pay the expenses aforesaid, that of Cox being equal to 9.94 per cent of the whole allotment, and that this interest is not attached to any land as a riparian right, but that the water it represents may be used at any place to which Cox or his successors in interest may wish to take it. The respondent also claims that the water settlement agreement of 1888, if properly

construed, constitutes a grant to *each* of the parties of the first part of his proportionate share of the *water*, for use at any place he sees fit.

[1] We think the evidence is sufficient to sustain the conclusion of the court below that the plaintiff was entitled to take 9.94 per cent of the waters allotted to the first parties by the agreement of 1888, including the waters accumulated by them in Buena Vista reservoir, and to use the same at any place it should think proper either on lands riparian to the river or its branches or on other non-riparian lands, but that the use should be limited to lands owned by Cox on July 28, 1888.

[2] The agreement of 1879 is not sufficient of itself to establish the riparian rights of the parties thereto in any land. It is too uncertain to have that effect. It does not describe any land, but merely shows the area "signed for," as one of the witnesses expressed it, by the several parties. Riparian rights can exist only as part and parcel of specific tracts of land, and any contract relating thereto would be void for uncertainty and of no avail unless it describes or refers to the land in a manner sufficient for identification. The number of acres "signed for" by the parties aggregates 98,188, Clarke & Cox signing for 14,520 acres. The evidence shows that Clarke & Cox at that time owned 24,880 acres of land in common, in Kern County, situated within the congressional townships enumerated in paragraph 17 of the agreement of 1888. The agreement of 1888 declares that it shall be construed as a covenant running with all the land owned or claimed by any of the parties thereto situated in said townships. It appears that Clarke & Cox made a partition of their lands. The court finds that Cox owned 30,940 acres of land in said townships at the time the agreement of 1888 was made. The evidence shows that a large part of it was the land owned by Clarke & Cox in 1879 and that only a comparatively small part of it, much less than ten thousand acres, was actually riparian to the river or its branches. Until the agreement of 1888 was made Cox contributed to the expense of litigation a sum equal to his proportion of the 98,188 acres "signed for" in the agreement of 1879. Thereafter he contributed in the same proportion to the expenses of the parties of the first part in constructing Buena Vista reservoir and to the expenses of its subse-

quent maintenance and operation. Miller & Lux, as manager for the parties of the first part, made contracts for the sale of water to other persons, receiving therefor several hundred thousand dollars and in some instances receiving monthly rentals of substantial amounts, for all of which it accounted to the first parties and paid to Cox his share thereof in proportion to his share of the lands aforesaid. Miller personally, as agent or trustee, also obtained title to the lands covered by said reservoir and conveyed to Cox and others of the first parties each a share therein proportioned to his ownership in the acreage signed for in the agreement of 1879. The proportion of the expenses and receipts paid to and by Cox obviously was fixed by reference to his ownership of the part of the land owned by Clarke & Cox in 1879. The evidence identifies only 3,840 acres of this land, and it is impossible to determine therefrom whether the remainder of it is or was at any time riparian to said river or any of its branches. There is evidence as to the identity of the lands "signed for" in the agreement of 1879 by each of the other parties thereto, except Miller & Lux, and it appears therefrom that a large part of that land was not riparian to the stream or any of its branches.

At the time the agreement of 1879 was made the extent to which riparian rights attached to lands owned by one person, consisting of adjoining parcels, one of which, only, abuts upon the stream, was not well understood in this state. Many persons supposed that such rights extended to all the lands owned by a single person, although obtained by separate conveyances, some of which did not convey any land abutting upon the stream, providing all the parcels were contiguous. The land was for the most part swampland which the parties had acquired from the state. It is not improbable that the parties to that agreement understood that they would have riparian rights in the stream for all of their lands if it was all contiguous to land which did abut upon the stream. **[3]** When the contract of 1888 was made, however, the opinion in *Lux* v. *Haggin* had definitely declared that only those tracts which were acquired by a single conveyance from the state and which abutted upon the stream were entitled to riparian rights. (69 Cal. 424, 425, [4 Pac. 919, 10 Pac. 674].) The parties must be presumed to have known this, since they were in-

terested in that case, and the agreement of 1888 must be understood to have been made with knowledge of this principle. It is now well settled. (*Boehmer* v. *Big Rock Irr. Dist.*, 117 Cal. 27, [48 Pac. 908]; *Alta etc. Co.* v. *Hancock*, 85 Cal. 227, [20 Am. St. Rep. 217, 24 Pac 647]; *Anaheim etc. Co.* v. *Fuller*, 150 Cal. 331, [88 Pac. 978]; *Gallatin* v. *Corning I. Co.*, 163 Cal. 416, [Ann. Cas. 1914A, 74, 126 Pac. 864].) It is apparent from that document that the first parties intended to secure the water allotted to them for the benefit of all the lands they owned at that time, to which it was feasible to carry the water. But they must have known that the riparian rights did not extend to a large part of those lands, and hence the court below might reasonably have drawn the inference that they intended that each of the first parties should have the right to use his share of the allotted water upon any land he then owned situated in the townships enumerated in paragraph 17 thereof, whether riparian or not. This being the case, it is obvious that the right in the waters so allotted was not exclusively riparian in character.

It does not follow, however, that the plaintiff, as successor of Cox, has the absolute right to the share of water in controversy and is entitled to use it at any place or to sell it to others for use on lands not owned by Cox in 1888, or, if then owned by him, not within the townships enumerated in paragraph 17 of the agreement of 1888. That paragraph not only contains the statement above quoted as to its provisions running with all the land owned by any of the parties situated within said townships, but it also declares that all said land "shall be subject to" all its provisions, into whosesoever hands it may come, by transfer or otherwise, from said parties. And paragraph 23 provides that the personal liability imposed under paragraph 17 should be deemed to be the liability of the person who should own the land at the time the liability should accrue, and the party who conveyed his interest "in said lands" should thereafter be freed from all liability under the agreement "to the extent and in the proportion" that the lands sold by him bear to the "whole amount of such lands . . . theretofore owned" by him. These provisions have the effect, by necessary implication at least, to confine the provisions of the agreement and the application thereof, so far as the

first parties are concerned, to the lands then owned by them and situated within said townships. It follows that the right of Cox and of the plaintiff as his successor, to the use of the water is confined to its use on land owned by Cox on July 28, 1888, and within said townships.

The subsequent conduct of the parties implies an understanding between them that there was an even narrower restriction, that is, a limitation of the use to the 98,188 acres "signed for" in the agreement or 1879: It is apparent that Miller and Cox must have known what lands were there referred to, for whenever by conveyances between them their comparative ownerships of that acreage were changed, the proportion of Cox in the common expense paid out by Miller & Lux in maintaining the reservoir was changed accordingly by Miller & Lux in rendering the account to Cox, always with the number 98,188 as the denominator of the fraction, and Cox acquiesced therein and paid his share so computed. Likewise, the distribution of the large receipts from sales of water or water rights was made in the same proportions and Cox received his diminished share without objection. If the identity of the 98,188 acres had been shown, there might be good reason for such further restriction of the use, but as the case stands, there is no means of ascertaining the lands comprising that acreage and that restriction cannot be declared or enforced, and we are bound by the broader area described in the agreement of 1888, it being the only writing on the subject which contains a description capable of being made certain.

The case is, we think, distinguishable in this respect from *Calkins* v. *Sorosis etc. Co.*, 150 Cal. 426, [88 Pac. 1094]. In that case the court said that while by the covenant in the agreement the water right was made an easement appurtenant to the land of the plaintiff, yet "we look in vain to the agreement or to this covenant to find anything limiting or restricting the use of the water to the lands of plaintiff. It is not a case where by the very terms of the conveyance the right to use the water was expressly limited to lands to which the right was made appurtenant." (150 Cal. 431, 432, [88 Pac. 1096].) And so it was held that the plaintiff might sell the water to others for use on other land. In this case, as we have said, the agreement

of 1888 necessarily implies such a limitation upon the use. Furthermore, it is to be remarked on this point that the agreement as a whole in connection with the circumstances under which it was made and the object sought to be attained thereby indicates strongly that such a limitation was understood.

[4] We are therefore of the opinion that the court erred in adjudging to the plaintiff the unlimited right to use the water at any place it should think proper. It should have restricted the use to the lands owned by Cox on July 28, 1888, situated within the townships aforesaid.

The point just stated may not be of great importance. It does not appear that the plaintiff intended to make any other use of the water than we have held it has the right to make. But the future might develop other desires or interests on that subject, and it is proper that the judgment should be modified so as to state the rights of the parties accurately. This modification was not the object sought by these appeals and we do not think it should have the effect of carrying costs in favor of the appellant.

The clause in the third paragraph of the agreement of 1888, by which the second parties acknowledge the right of the first parties as riparian proprietors along the river and its branches to the proportion of water allotted to said first parties, is not sufficient to defeat the conclusion we have reached. [5] Since the right of each riparian proprietor as against appropriators, extends to the entire stream, the first parties would each have the right as riparian proprietors to all of the waters thereof, although only a small part of the land of each actually abutted upon the stream. The second parties all claim solely by appropriation. An acknowledgment by them of the riparian rights of the first parties would, therefore, be appropriate if any part of the lands of each of the first parties was contiguous to the stream, and it does not of necessity imply that all of it was so contiguous or was entitled to riparian rights.

There are other circumstances appearing in the evidence which are of some weight as tending to the conclusion that the rights secured to the first parties in the agreement of 1888 was not considered by them as exclusively of a riparian character and that they did not understand that they were not entitled to use it upon lands not in fact riparian to

the stream. We do not deem it necessary to state these matters in detail. It is sufficient to say that upon the whole case we think the findings complained of, except as above stated, are sustained by sufficient evidence.

### Case No. 4994.

The plaintiff has appealed from certain parts of the judgment entered in the court below declaring that certain lands owned by the plaintiff as successor to Frederick Cox is subject to a charge in favor of Miller & Lux for a portion of the expenses that might be incurred in future by that corporation in maintaining and operating the Buena Vista reservoir and in constructing other canals and works for the control of the waters owned in common by the parties of the first part to the agreement of 1888. This appeal is numbered L. A. No. 4994 and is presented upon the same record as case No. 4993.

The court found that the plaintiff had acquired all or a large part of the land formerly owned by Cox, situated in the townships enumerated in paragraph 17 of said agreement, and that it had afterward sold a large part of said land to other persons with reservations excluding from the conveyance whatever rights the plaintiff had in the water allotted to the first parties by the agreement of 1888 aforesaid, and that the plaintiff still owned certain parcels of said land, describing them, situated in township 27 south, range 22 east, aforesaid, containing 3,840 acres. The judgment declared that this 3,840 acres was subject to the charge aforesaid for the future expenses to be incurred and paid by Miller & Lux as aforesaid in the common enterprise of maintaining their water rights and works.

Frederick Cox died in the year 1906. Administration of his estate took place in the superior court of Sacramento County. The decree settling the final account and making distribution thereof was entered in that court on April 18, 1908. During the administration, Miller & Lux presented a claim against the estate for the contingent expenses thereafter to be incurred by it in maintaining and operating said reservoir and waterworks. Said corporation also filed a contingent claim for moneys to become due to Miller & Lux under an agreement executed between Miller & Lux on October 6, 1898, providing for the construction of certain canals and the payment of rental therefor in case they were

made use of by Cox and for the payment of part of the expense thereof by Cox. Both claims were duly allowed in the course of administration. At the time of the final settlement these claims had not been adjusted or disposed of in any way. As they must of necessity have arisen in the future and the amounts were not then determinable, they could not have been adjusted by a present payment. Upon the hearing, all of the parties entitled to distribution were present in open court, together with the attorney for Miller & Lux, and thereupon in pursuance of an agreement between them made in open court a decree of distribution was by consent of all parties made and entered distributing the aforesaid 3,840 acres of land to the residuary devisees and declaring that the same was subject to a charge and burden imposed thereon by the provisions of the agreement of 1888 aforesaid in favor of Miller & Lux, and that said burden and charge was "to run with and bind the said lands," and imposing a charge upon the said land for the expense to be incurred and moneys to become due under said agreement of October 6, 1898, which also was "to run with and bind said lands."

During the trial of the present action in the court below the defendant, Miller & Lux, by leave of court, filed an amendment to its answer setting up these charges and burdens as a lien against the aforesaid lands asking a judgment declaring the plaintiffs should hold said land subject to said charges and burdens. The court made findings in accordance with the amendment and judgment was rendered accordingly imposing upon said 3,840 acres of land a lien for the charges and burdens mentioned in favor of said Miller & Lux.

The plaintiff claims that the court erred in allowing the defendant to amend its answer in the manner above indicated. The object of plaintiff's action was to quiet its title to certain water rights and to certain lands, including said 3,840 acres, against the alleged unfounded claims of the defendants. Miller & Lux claimed that such water rights as plaintiff had were part and parcel of the said 3,840 acres of land, either as a riparian right or as an appurtenance thereto. [6] It was proper, therefore, for the defendant, if it had a claim, present or prospective, against the plaintiff, which would constitute a lien upon said lands, of which

the water rights were a part, to assert the same and have its lien established in the action to quiet title. [7] The matter of amending pleadings during the trial is largely in the discretion of the trial court, and we see nothing in the record to indicate any abuse of discretion in allowing the answer to be amended as aforesaid.

Appellant also claims that the part of the judgment appealed from is based on the theory that the covenants of the agreement of 1888 were covenants running with the land, and that they are not of that character. We do not think this proposition is of any importance. It is immaterial what the nature of those covenants were. The judgment of the court below was obviously based upon the lien or burden established by the decree of distribution in the estate of Cox. That decree declared that this burden or charge existed against the land and that it should "run with and bind the land." By this language the claim in favor of Miller & Lux was established as a lien upon the 3,840 acres of land described therein and declared to be subject thereto. (*Fresno C. & I. Co.* v. *Rowell*, 80 Cal. 116, [13 Am. St. Rep. 112, 22 Pac. 53]; *Fresno C. & I. Co.* v. *Dunbar*, 80 Cal. 535, [22 Pac. 275].) It is therefore immaterial whether the covenants of the agreement of 1888 were or were not covenants running with the land. [8] Whatever their character, the effect thereof was adjudicated in the decree of distribution, which was binding upon the distributees to whose title the plaintiff has succeeded.

Appellant insists that part of the decree of distribution imposing upon the land the lien above mentioned was void for two reasons: First, because it was beyond the jurisdiction of the court to make such a decree; second, because its provisions are so uncertain as to render it unenforceable. We think there is no doubt of the jurisdiction of the court to enter the decree. This is not a case where the court was endeavoring to determine a controversy between the distributees and third persons regarding the title to the land distributed, adverse to the title of the decedent or to the title of distributee. Cases holding that the court has no jurisdiction to determine such controversies upon the final settlement of the estate in probate are not in point here. Miller & Lux claimed that it had a contingent claim against the estate for expenses thereafter to be incurred, and that

such claim was a charge or lien upon a part of the land about to be distributed. The court was making a final settlement of the estate. In order to do so it was necessary that it should make some provision regarding the payment of said claim. It had jurisdiction of the parties and of the property, for all purposes necessary to the settlement of the estate. The residuary devisees, the only persons interested in the land as successors of Cox, were present in court and agreed to the distribution made and to the imposition of the lien. [9] It has often been decided that the court in probate has power, in distributing the estate of a decedent to declare a lien thereon in favor of a third person and that the distributee shall hold it subject to such lien. (*Estate of Moore,* 96 Cal. 530, [31 Pac. 584]; *Finnerty* v. *Pennie,* 100 Cal. 407, [34 Pac. 869]; *Estate of Boyes,* 151 Cal. 151, [90 Pac. 454]; *Estate of Clanton,* 171 Cal. 386, [153 Pac. 459].)

[10] The contention that the decree is void for uncertainty is also untenable. The claim for which the lien was imposed was for moneys to become due in the future, the amount of which could not be determined in advance. If the lien existed it could be enforced when the moneys become due to Miller & Lux under the provisions of the agreement of 1888 aforesaid, and the agreement of October 6, 1898, aforesaid, both of which were referred to in the decree of distribution. The amount thereof could be established at that time, but not before. The plaintiff argues that the decree leaves it to Miller & Lux to be the sole judge of the amount of expenses to be incurred, and therefore delegated to that corporation the functions of the court. This, however, is obviously not the case. The decree of distribution merely imposed the lien for whatever amount should legally become due thereafter to Miller & Lux on account of the agreements referred to. It would, of course, be necessary, if there was any dispute about these amounts, or their validity, or legality, that Miller & Lux should resort to a court of competent jurisdiction to establish and enforce its lien. That corporation would not be the sole judge of the legality or extent of the charges to be imposed. If they were not justified under the contracts referred to, if they were improper charges, or if the contracts do not authorize Miller & Lux to charge the expenses

claimed against the owner of the land, then, of course, the court to which the matter was submitted would refuse to declare or enforce. a lien therefor. We find no merit in the points made in support of this appeal.

It is ordered that the judgment be modified by striking out the words "at any place within its lawful control, and for any lawful purpose it may think proper, whether on lands riparian to said Kern River, Buena Vista Slough, Kern and Buena Vista Lakes, the slough connecting said lakes, or elsewhere," found at the end of the first paragraph of the part. of the judgment declaring the rights of the plaintiff immediately following the words "and to use and dispose of the same in any lawful manner," and inserting instead thereof the following: "Upon any lands owned by Frederick Cox on July 28, 1888, situated in any of the congressional townships and portions of townships described in paragraph seventeen of the agreement of July 28, 1888, attached to the complaint and marked 'Exhibit A' thereto, but not elsewhere."

As so modified, the judgment is affirmed. The court below is directed upon the going down of the *remittitur* to re-enter the judgment as thus modified. The respective respondents are to recover costs of appeal from the respective appellants in each case.

Wilbur, J., Lennon, J., Lawlor, J., Angellotti, C. J., and Sloane, J., concurred.

Olney, J., did not participate.

Rehearing denied.

All the Justices concurred, except Olney, J., who did not vote.