[L. A. No. 15252. In Bank.—March 11, 1937.]

MILLER & LUX, INC. (a Corporation), Plaintiff and Respondent, v. SAN JOAQUIN LIGHT & POWER CORPORATION (a Corporation), Defendant and Appellant; CHOWCHILLA FARMS, INC. (a Corporation), Intervener and Respondent; THE PINES, INC. (a Corporation), Intervener and Appellant.

Thomas J. Straub, W. R. Dunn and Conley, Conley & Conley for Defendant and Appellant.

M. K. Wild for Intervener and Appellant.

J. E. Woolley and V. J. McGovern for Plaintiff and Respondent.

Athearn, Chandler & Farmer and Milton T. Farmer for Intervener and Respondent.

THOMPSON, J.—This is the third time this case has been before the reviewing courts. On the first occasion, 120 Cal. App. 589 [8 Pac. (2d) 560], the question presented was whether the court had erred in sustaining a demurrer to the answer of the defendant. It was held that the demurrer was improperly sustained as to several of the separate defenses, but was properly sustained as to several others. On the second occasion, 136 Cal. App. 493 [29 Pac. (2d) 296], the appeal was from a judgment after trial. The appellate court determined that the trial court had misconstrued the contract involved herein, and that the water diverted on the south fork of the San Joaquin River by the Edison company, other than that diverted on Big Creek, must be added to the flow of the river at plaintiffs' measuring point in order to determine the right of the defendant to store. While reference may be had to those cases for a more complete statement of the facts, the contract involved in this prolonged litigation in brief is as follows. It recites the ownership by plaintiff and the predecessors in interest of

the intervener Chowchilla Farms, Inc., of a great deal of land (Miller & Lux owned and irrigated about 400,000 acres; Chowchilla Farms owned and irrigated about 43,000 acres) and that they owned riparian and appropriative rights in the flow of the San Joaquin River; that the defendant had constructed two small storage dams on the north fork of the San Joaquin capable of impounding about 5,000 acre-feet of water (Crane Lake Reservoir 4,300 and Chilcoot Lake 600 acre-feet); that defendant was desirous of increasing its storage capacity to a maximum of about 65,000 acre-feet, and that in order to prevent objection to the storage of the waters of the north fork by defendant on the part of plaintiff and the intervener Chowchilla Farms who were entitled under the law to the normal flow of the river by and through their properties, a method of diversion and storage was agreed upon, with certain minimum flows of the river below which the defendant would not be permitted to store. It was agreed that the defendant should not be permitted to store during the months of April, May, June, July and August when the flow of the river, measured at Lone Willow Slough, a point below the junction of the north and south forks of the river and above the land of plaintiff and the intervener Chowchilla Farms, was 3,000 cubic feet per second or under; that during the remainder of the year when the flow of the river at the point mentioned was less than 1500 cubic feet per second, the defendant would not be permitted to divert and store. The measurements at the point indicated were to be made by plaintiff by means of instruments and gauges installed by defendant, and for the proper operation of which defendant was to contribute, for the purpose of employing a man to tend the same, the sum of $75 per month. A second measuring point was established on the north fork of the river near the reservoir of defendant at the point where the natural flow was not interfered with, the measuring devices installed at this second point to be under the charge of defendant and for the purpose of enabling defendant in the event of storms to store water during those months when the minimum flow was 1500 cubic feet and by reason of the storm the fork was flowing in excess of the minimum. In other words, the second point was agreed upon to enable defendant to store during that lapse of time which would occur before the storm water reached the gauge at

Lone Willow Slough several miles down the river. The defendant agreed that at least once a month a copy of the reading of the gauge installed at the second point should be sent to plaintiff, and that the measurements at the first point mentioned should be sent by mail to plaintiff at its office in San Francisco. In order to enable the defendant to keep in touch with the measurements at Lone Willow Slough it was to install a telephone between its plant and the point mentioned. It was also agreed that during certain months the defendant might be compelled by plaintiff to release stored waters for irrigating purposes. It should be noted in this connection that after such releases the minimum storage would be approximately 15,000 acre-feet.

This action was commenced in April, 1929, to enjoin the defendant from diverting and storing water at times when the river was flowing less than the amounts determined by the agreement, it being alleged that the defendant had, during the months of February and March, 1929, stored water flowing in the north fork on occasions when the flow was less than 1500 cubic feet of water. The intervener, The Pines, Inc., has constructed resorts on the shores of Crane Lake, created by the storage of the waters, and claims the right to be protected in its investments therein. Upon the second trial, judgment was rendered in favor of plaintiff and the intervener Chowchilla Farms, enjoining defendant from storing when the river is flowing less than the minimum amounts determined by the contract, and the defendant and the intervener, The Pines, Inc., have appealed therefrom.

For the purposes of our discussion, we shall hereafter refer to plaintiff and the intervener Chowchilla Farms, Inc., as respondents, and to both of the other parties as appellants, which expression when applied to the contract shall include the predecessors in interest of the parties.

Briefly stated, it is the contention of the appellants that the contract, the substance of which we have already recited and which was entered into in June, 1909, is void because (1) it constitutes an attempt by private parties to interfere with property dedicated to a public use; (2) it is uncertain by reason of the fact that there is not contained in the agreement a description of the properties owned by the respondents. It is also contended, and this is one of the principal reasons urged by the appellants for the reversal of the judgment,

that inasmuch as the water diverted was dedicated to a public use the public gained a right to divert water at times when the river was flowing less than the minimum amounts prescribed by the agreement. Further, it is asserted that the public gained a prescriptive title to divert the flow of the river through the defendant, a public utility, and that plaintiffs may not now be heard to complain. In reply to this, the respondents direct our attention to a contract executed in 1919, which they say ratifies and confirms the agreement of 1909, under which it was agreed that the defendant should be permitted to build another dam on the river with a capacity in the neighborhood of 3,000 acre-feet; and also that the defendant ratified and confirmed the agreement of June, 1909, as late as July, 1922, when the respondents consented, subject to the conditions of the contract of 1909, to permit the defendant without objection to divert an additional 175 cubic feet per second of water at the dam near the junction of the two forks. The respondents also claim that they did not have notice of the diversions, or sufficient knowledge to put them on inquiry, until some time in 1920, when they made vigorous protest to the appellant power company of the wrongful diversions and received from it assurance that the contract would be complied with; that on subsequent occasions they made like protests and received like assurances. It is also asserted that the public never gained any right to a use, nor were the waters dedicated to a public use which were diverted when the river was flowing less than the minimum flows established.

The appellants further assert that the judgment is contrary to the law of the case as established by the two former appeals and that, further, the contract is one which cannot be specifically enforced by the respondents, and therefore an injunction may not issue. Again it is urged that the method of measurement adopted by the court in its judgment (adding the amount diverted by the Southern California Edison Company to the flow of the river at the measuring points) amounts to the writing of a new contract by the court for the parties and is impracticable; that The Pines, Inc., have acquired rights by reason of having constructed valuable improvements around the lake, and that respondents are estopped as against The Pines, Inc., to now prevent the diversions of the water when the river is flowing less than

the contract requires. It is further urged that all of the necessary parties to the action were not before the court, the argument in this instance proceeding upon the theory that the plaintiff had sold some of its properties under contract to others.

Considering these arguments in the order of their presentation, it seems obvious that the first argument is unsound because by the contract the water which had been theretofore dedicated to a public use, consisting of approximately 5,000 acre-feet, was not in any manner taken from the public. The court found that it had not been taken and it seems obvious that it could not have been taken for the following reasons: (1) The minimum storage resulting even after releases demanded by plaintiffs would never be less than approximately 15,000 acre-feet, as compared to the maximum of 5,000 acre-feet theretofore dedicated to a public use; (2) the defendant was acquiring water to be dedicated to a public use subject, of course, to respondents' rights, greatly in excess (maximum capacity 65,000 acre-feet) of that which it was formerly authorized to divert and store.

The second argument, to wit, that the contract is void because it is uncertain, is equally without foundation. The contract does not purport to fix certain riparian rights for any particular land. It recognizes the existence of the riparian and appropriative rights of respondents, and their right to have the entire flow of the river pass along and through their lands and to their canals and irrigating works, and provides that respondents will not object to the interference with the flow of the river and their rights provided the minimum flows of 3,000 and 1500 cubic feet are not interfered with. Appellants place great reliance upon the case of *Title Ins. etc. Co.* v. *Miller & Lux,* 183 Cal. 71 [190 Pac. 433], but a reading of that case demonstrates that what was there said is not pertinent to the case here. The contract concerning which the statement was made that riparian rights can exist only as a part and parcel of specific tracts of land was a contract by which the parties agreed to share the expense of litigation in proportion to the number of acres owned by them. Manifestly, two parties may as between themselves contract with respect to certain designated rights without describing all of the incidents thereto and without necessarily describing the property to which the

rights appertain, or the lands for the benefit of which the water has been appropriated.

As has been already indicated, the argument most persistently advanced by the appellants is that the water having been dedicated to a public use, the public gained a right to divert and store the same when the river was flowing less than the amounts required by the contract. It is well settled in this state that the law relating to the reasonable and beneficial use of water is to be applied in settlement of all water controversies. (*Gin S. Chow* v. *Santa Barbara*, 217 Cal. 673 [22 Pac. (2d) 5], *Peabody* v. *Vallejo*, 2 Cal. (2d) 351 [40 Pac. (2d) 486], and *Tulare Irr. District* v. *Lindsay-Strathmore Irr. Dist.*, 3 Cal. (2d) 489 [45 Pac. (2d) 972].) If the diversion and storage of the water was not a reasonable and beneficial use of the waters flowing in the river then the public could not have gained a right thereto. It seems obvious to us that it cannot be said that the water diverted and stored when the river was flowing below the minimum stages was a reasonable use. The trial court found that the public had no interest in the diversion or storage of water when the river was flowing below the minimum stages, and in truth proceeding upon the theory of reasonable and beneficial use found that the public had acquired no title therein. A portion of the finding in this particular reads as follows:

"That it is not necessary, in order for defendant to adequately serve the public, that it store and impound the waters of the North Fork of the San Joaquin River otherwise than as provided for in said contract of June 14, 1909; and that the continued violation of said contract by defendant in storing water of the North Fork below the limitations expressed in said contract will not be of benefit to the public, and is not in the public interest; and that without the use of said water stored below the limitations of said contract, the public will be served with power by said defendant in the same quantities and in the same manner that the public would be served if said contract is violated by said defendant by impounding water below the limitations expressed in said contract."

This finding, we believe, is supported by the evidence, as a moment's reflection will demonstrate. The right and theory of storage is to protect the utility against minimum flows. The San Joaquin River is a river of rapidly-fluctuating flows,

both as with respect to days and months, and even hours. The court found that there were great diurnal fluctuations in the river. When the water is at a low stage the only possible reasonable use by the power company is the then use of the water for the purpose of then and there manufacturing electric energy. When the river is at its highest stages, the diversion and storage of water is reasonable and beneficial in order to provide against the contingency of a low flow in the river. We arrive at the same conclusion by a slightly different method of reasoning. ■ The rule that one cannot sit idly by while his property is being devoted to a public use and expensive works erected to that end and then assert his claim to injunctive relief has its foundation "chiefly in the inconvenience to the public if the service is interrupted by the issuance of an injunction to restrain the use". (*Burr* v. *Maclay Rancho Water Co.*, 160 Cal. 268, 280 [116 Pac. 715].) It would seem to logically follow that unless the public is interested, that unless the service is to be impaired, the rule should not apply. This is but another way of saying that the use by the public must be beneficial.

■ This brings us to the point, that if the water diverted when the river is flowing below the minimum stages fixed by the contract has not been devoted to a reasonable and beneficial public use and if the public has not gained a right thereto, then the power company is, in the face of its affirmance and reaffirmance of the contract, attempting to take advantage of its own wrong. A reading of the correspondence which passed between these parties, commencing in 1919 and down to a short time before this action was brought, clearly demonstrates that the appellant power company was relying upon the contract of June, 1909, and the contract of 1919, and was protesting its willingness to comply with all of the provisions thereof. To permit the defendant at this time to rest upon its violation of the contract would be to sanction its own wrongdoing. ■ The trial court found in detail upon sufficient evidence that the respondents were not barred by laches, estoppel, waiver of the contract provisions, or the statute of limitations to maintain the action. A portion of the finding of the court is as follows:

"That it is true that since the construction of Crane Valley Lake and Chilcoot Lake referred to in the answer of de-

fendant, defendant has at various times reservoired and
stored in said lakes waters of the North Fork of the San
Joaquin River and its tributaries, when defendant had no
right to store and reservoir said water under said contract
of June 14, 1909. That when such storage and reservoiring
of said waters were done by said defendant, same were not
continuous, but were intermittent, and were at all times
mentioned herein unknown to the intervener Chowchilla
Farms, Inc., and to its predecessors in interest. That on the
16th day of September, 1919, plaintiff and defendant entered
into a contract under the terms of which defendant was
permitted to construct on the main San Joaquin River imme-
diately below where the said North Fork enters said river a
dam, tunnel and power plant; that shortly thereafter said
works were constructed and are known as the Kerckhoff
Power Plant; that said power plant is so situated that it
can and does utilize not only the natural stream flow, but
water discharged from defendant's storage on said North
Fork and water discharged from Southern California Edison
Company Limited's storage in Huntington Lake, Florence
Lake and Shaver Lake; that said contract permitting the
construction of Kerckhoff Power Plant referred to the said
contract of June 14, 1909, and reaffirmed said contract.

"In the year 1920 said defendant stored, as aforesaid,
and plaintiff learned of such storage for the first time in that
year, and immediately wrote defendant a letter of protest and
demanded that defendant abide by the provisions of said
contract of June 14, 1909; and defendant made no claim of
any right to store other than is provided for in said contract,
but, on the contrary, led plaintiff to believe that said contract
would be conformed to in all respects; and after the year
1920, on each occasion when plaintiff learned that defendant
had stored water below the limitations of said contract, said
plaintiff protested such storage and demanded in writing
of defendant that said contract be conformed to, and said
defendant promised and agreed that it would not violate
the provisions thereof.

"That in the month of July, 1922, plaintiff and defendant
entered into a further agreement supplementing said agree-
ment of the 16th day of September, 1919, under which de-
fendant received the right to divert an additional one hun-

dred and seventy-five (175) cubic feet per second of water through the Kerckhoff Power Plant; that said additional right was granted subject to the terms and conditions of said agreement of September 16, 1919; that at none of said times did defendant make any claims to the waters of said river adverse to the rights of plaintiff and intervener Chowchilla Farms, Inc., as set out in said contract of June 14, 1909.

"That owing to the fluctuation in the flow of said river from day to day, known as the diurnal change, it was impossible for the plaintiff to know from the storage data furnished it by defendant whether or not defendant was storing contrary to the terms of said agreement; that the only information supplied plaintiff by defendant concerning its storage operations referred to the mean flow of the river during a period of twenty-four hours, and did not at any time show the diurnal changes in the flow of the river. That defendant for long periods of time did not supply plaintiff with any information concerning its storage operations, and particularly concerning the time and stages of the river flow when it was storing water, and plaintiff from time to time demanded of defendant that it supply such information.

"That it is not true that defendant relied upon any lack of protest from plaintiff, or from intervener Chowchilla Farms, Inc., or its predecessors in interest, or that defendant constructed additional power houses and facilities, or increased its output of power for the use of the public, on account of any lack of protest on the part of plaintiff or intervener Chowchilla Farms, Inc., or its predecessors in interest."

It is true that appellants argue that this finding is unsupported in the evidence so far as the question of notice is concerned. Without going into details with respect thereto, it is enough to say that the finding is amply justified.

We do not intend to say that a party may not, for the purpose of asserting title resulting from adverse possession, take advantage of his own wrong; but in all such cases the possession must be open, notorious, and adverse, and under claim of right or title. We have here an instance where the power company was protesting that it claimed no more than that allowed it by the contract.

██ With respect to the argument that the law of the case was established with reference to the interpretation of the contract, we must confess that the law of the case was therein determined; but the judgment here, in our opinion, does not violate the law of the case as there laid down. One of the findings of the court is that with the exception of the storage on Big Creek, the waters diverted and stored by the Edison Company may be added to the flow of the river at the plaintiff's measuring point for the purpose of determining the right of the defendant to divert and store in accordance with the contract. As we read the opinion in the 136 California Appellate Reports, this is exactly the interpretation put upon the contract by the appellate court. We might have some doubt concerning whether the interpretation adopted by the appellate court is correct in view of the fact that the contract seems to imply that such storage shall not be added to the flow of the river. But be that as it may, the law of the case was established in that opinion, and as we read the finding of the court it has strictly conformed thereto.

██ With respect to the contention that the contract cannot be specifically enforced and therefore it was improper for the court to grant injunctive relief, the appellants ground their argument first upon the proposition that while the contract of 1909 required the plaintiff to make measurements of the flow of the river at Lone Willow Slough, that plaintiff had failed in accordance with the contract to report the daily flow of the river at that point. The evidence discloses that the defendant was to pay not to exceed $75 per month for the employment of a man to measure the river at that point, and that for more than five years the defendant failed to make any such payments, and the evidence also establishes that the defendant asked for no such records. Furthermore, it appears that while this provision did in truth call for personal services, yet it was personal service to be rendered to a degree by the defendant, and that it was only incidental to the main features of the contract. It was, indeed, agreed upon only as a means of enforcing the contract. Under such circumstances the failure of the plaintiffs should not bar their right to enforce the contract, particularly where the defendant itself was guilty of a contemporaneous failure to comply with the particular provision. ██ It

is urged that there was no mutuality of remedies. It is difficult to follow the appellants' argument in this instance. Certainly if the respondents had tried to assert rights by force or otherwise contrary to their stipulations in the contract, a court of equity would have held that plaintiff was without such right and would have enjoined any forcible attempt to assert rights contrary to the provisions of the contract. It is also asserted by appellants that the plaintiff is barred by laches and that the public interests have intervened. The answer to this argument is contained in the answer heretofore made to similar questions.

As we have noted, the argument is advanced that the court in effect made a new contract for the parties when it established a method for the measurement of the flow of the river different from that fixed in the contract, and a method which is impractical and extremely difficult. In this regard a reading of the opinion in 136 California Appellate Reports at page 493, is interesting. The appellant there argued, and was sustained (as to the diversions of water except on Big Creek), to the effect that the contract required that the water diverted by the Edison Company be added to the flow of the river in order to determine its rights. To permit the appellant to now argue that this method is contrary to the contract would be to permit it to right-about-face, or to blow hot and cold. It cannot now be heard to complain of a method of measurement which it urged and succeeded in having established as to the proper interpretation of the contract, and of which respondent does not now complain. It is further to be noted that there is relatively a very small portion of the year when such a method is required.

We now come to the claim that respondents are estopped to deny the right of the defendant to divert when the river is flowing less than the required amounts by reason of the fact that The Pines, Inc., made vast improvements around the lake, relying upon the diversion of the water. This argument is likewise without merit. The evidence fails to disclose that there would be insufficient storage in the lake if the defendant were denied the right to store below the limits. In fact, the court found upon evidence which fully supports the finding as follows:

"That it is not true that the availability, attractiveness or success of The Pines, Inc., as a summer resort, or Crane

Valley Lake as a summer resort, will be seriously affected if defendant is required to conform to the storage limitations expressed in said contract of June 14, 1909. That in normal years said lake will be filled, or substantially filled, with water, but in dry years said lake will be only partially filled under any conditions, but will have less water therein if defendant conforms to said storage limitations.

"That it is not true that the granting of an injunction herein on behalf of plaintiff and intervener Chowchilla Farms, Inc., will cause said Crane Valley Lake to be eliminated and destroyed, or greatly reduced in size, or will leave ugly and unhealthful mud flats adjacent to the property so leased by intervener The Pines, Inc.

"That it is true that in the normal operation of Crane Valley Reservoir the defendant stores water therein during the period of large runoff, and withdraws the water therefrom commencing generally in the month of July. That as the water is drawn off during such normal operation of said reservoir, mud flats appear as soon as said water is commenced to be drawn off, and are progressively enlarged as the reservoir or lake is emptied."

The truth of the situation is that the graphs introduced by the power company indicate that year after year the reservoir could have been filled with diversions and storage within the contract limits. Aside from the finding, which completely disposes of appellants' contention, we should be compelled to deny it force upon the same theory and findings by which we have concluded that respondents were not foreclosed of their right to press their claim for injunctive relief against the power company.

With respect to the last argument of appellants that all of the persons necessary to the action were not before the court, it is sufficient to cite section 385 of the Code of Civil Procedure, which in its material part provides that an action or proceeding may be continued in the name of the original party after transfer, or may be continued in the name of the grantee. It cannot be disputed that the plaintiff and intervener were the original parties in interest, and therefore were authorized to bring the action for relief under the contract.

No other points require discussion. The judgment is affirmed.

Edmonds, J., Waste, C. J., Curtis, J., Shenk, J., and Seawell, J., concurred.

Rehearing denied.