[L. A. No. 19610. In Bank. June 3, 1949.]

CITY OF PASADENA, Plaintiff and Respondent, v. CITY OF ALHAMBRA et al., Defendants and Respondents; DIVISION OF WATER RESOURCES, Referee and Respondent; CALIFORNIA-MICHIGAN LAND AND WATER COMPANY (a Corporation), Appellant.

Goodspeed, McGuire, Harris & Pfaff, Paul Vallée, Richard C. Goodspeed and J. Donald McGuire for Appellant.

A. E. Chandler, Special Counsel, Harold P. Huls, H. Burton Noble, City Attorneys (Pasadena), C. C. Carlton, Spencer Burroughs, Henry Holsinger, James C. Bone, T. Guy Cornyn, City Attorneys (Arcadia), Gerald E. Kerrin, Robert E. Moore, Jr., Hahn & Hahn, Edwin F. Hahn, Potter & Potter, Bernard Potter, Sr., Merriam, Rinehart & Merriam, Ralph T. Merriam, Laurence B. Martin, Frederick G. Stoehr, Emmett A. Tompkins, City Attorney (Alhambra), Kenneth K. Wright, Special Counsel, Paul F. Garber, City Attorney (Monrovia), Walter F. Dunn, Thomas Reynolds, City Attorneys (Sierra Madre), Anderson & Anderson, Trent G. Anderson, John C. Packard, Bacigalupi, Elkus & Salinger, Claude Rosenberg, Derthick, Cusack & Ganahl, W. J. Cusack, Wilton W. Webster, Dunn & Sturgeon, Walter F. Dunn, Chandler & Wright, Howard Wright, Bailie, Turner & Lake, Norman A. Bailie, Cruickshank, Brooke & Dunlap, Boyle & Holmes, John W. Holmes, Frank P. Doherty, Gibson, Dunn & Crutcher, Ira C. Powers, Harold W. Kennedy, County Counsel (Los Angeles), and S. V. O. Prichard, Assistant County Counsel, for Respondents.

Martin J. Weil, Wm. J. De Martini, J. A. McNair, J. Arthur Tucker, W. F. Kiessig, Harrison Guio, L. A. Gibbons, Jerry H. Powell, Douglas C. Gregg, Lawler, Felix & Hall and Pillsbury, Madison & Sutro as Amici Curiae on behalf of Respondents.

GIBSON, C. J.—Plaintiff city, the chief producer of water from a 40 square mile alluvial-filled basin of ground water* known as the Raymond Basin Area, instituted this litigation to determine the ground water rights within the area and to enjoin an alleged annual overdraft in order to prevent eventual depletion of the supply. Pursuant to section 24 of the Water Commission Act, which was then in force (Stats. 1913, p. 1012, as amended, Deering's Gen. Laws (1937), Act 9091; now Wat. Code, §§ 2000-2050), the trial court referred the matter to the Division of Water Resources of the Department of Public Works for a determination of the facts, and the ensuing report of the division was received in evidence. On the basis of this report all of the nondisclaiming parties, with the exception of the defendant California-Michigan Land and Water Company, a public utility and the sole appellant herein, entered into a stipulation for a judgment allocating the water and restricting total production to the safe annual yield. The court, after hearing evidence presented by appellant in opposition to the report, rendered a judgment substantially enforcing the terms of the stipulation against all parties, including appellant.

The principal issues presented on this appeal are whether the trial court properly limited the amount of water that appellant may take from the ground in the Raymond Basin Area, and whether it erred in placing the burden of curtailing the overdraft proportionately on all parties. Before discussing these issues on the merits, we will consider certain contentions involving jurisdiction, procedure and remedy.

### PRELIMINARY CONTENTIONS

The complaint was filed on September 23, 1937, and the trial was not commenced until May 18, 1944. A dismissal is made mandatory by section 583 of the Code of Civil Procedure, except in certain cases, unless the action is brought to trial within five years after the plaintiff has filed his action. It is settled, however, that in computing the five-year period the time during which, "for all practical purposes, going to trial would be impossible, whether this was because of total lack of jurisdiction in the strict sense, or because proceeding to trial would be both impracticable and futile," is to be excluded. (*Christin* v. *Superior Court*, 9 Cal.2d 526, 533 [71

---

*In accordance with the terminology employed by the trial court and the parties, the expression "ground water" will be used to refer to water beneath the surface of the ground.

P.2d 205, 112 A.L.R. 1153] [time consumed by appeal from order granting change of venue]; *Pacific Greyhound Lines* v. *Superior Court,* 28 Cal.2d 61, 64 [168 P.2d 665] [time during which one defendant was in military service and stay might have been granted]; *Judson* v. *Superior Court,* 21 Cal.2d 11, 14 [129 P.2d 361] [time defendant avoided service of summons by evasion and concealment]; *Westphal* v. *Westphal,* 61 Cal.App.2d 544 [143 P.2d 405] [time during which coplaintiff had an appeal pending].)

The order of reference was made on February 8, 1939; the referee's report was filed on July 16, 1943, and, thereafter, respondents proceeded with reasonable dispatch to bring the cause to trial. The issues to be tried were dependent to a great extent upon the facts to be ascertained by the referee, and it would have been impracticable, if not futile, to proceed to trial prior to the completion of the report. It follows that the time consumed by the reference should be excluded in computing the five-year period, and that, therefore, the action was not subject to dismissal under the provisions of section 583.

The "Division of Water Resources, Department of Public Works, State of California," was appointed as referee pursuant to section 24 of the Water Commission Act which provided: "In case suit is brought in any court of competent jurisdiction for determination of rights to water or the use of water, . . . the court may, in its discretion, refer such a suit to the state water commission for investigation of and report upon any one or more or all of the physical facts involved, in which event, said commission may, in its discretion, base its report solely upon its own investigation or investigations or in addition thereto may hold a hearing or hearings and take testimony and the report filed by the commission upon such a reference for investigation by it shall be prima facie evidence of the physical facts therein found. . . ."

Every recent major water law decision of this court has expressly or impliedly approved the reference procedure provided by section 24 and has recommended, in view of the complexity of the factual issues in water cases and the great public interests involved, that the trial courts seek the aid of the expert advice and assistance provided for in that section. (See *Fleming* v. *Bennett,* 18 Cal.2d 518, 522 et seq. [116 P.2d 442]; *Meridian, Ltd.* v. *San Francisco,* 13 Cal.2d 424, 457 [90 P.2d 537, 91 P.2d 105]; *Rancho Santa Margarita* v. *Vail,* 11 Cal.2d 501, 558-559 [81 P.2d 533]; *City of Lodi* v. *East*

*Bay Mun. Utility Dist.*, 7 Cal.2d 316, 341 [60 P.2d 439];
*Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.*, 3 Cal.2d
489, 575 [45 P.2d 972, 1014]; *Peabody* v. *City of Vallejo*, 2
Cal.2d 351, 373-374 [40 P.2d 486]; *Wood* v. *Pendola*, 1 Cal.
2d 435, 443 [35 P.2d 526].)

In sustaining and approving the reference procedure, it was
stated in the Fleming case that "all of the pertinent consti-
tutional safeguards were observed by the legislature in enact-
ing the provisions of section 24. . . ." (18 Cal.2d at p. 528.)
The opinion did not mention whether section 24 conflicted
with article III, section 1, of the Constitution, which pro-
vides for the separation of powers, or discuss whether such an
order of reference invalidly subjects an executive branch or
division and its officers to the control of the judiciary. It
was, however, expressly held (18 Cal.2d at pp. 523-525) that
section 24 does not provide for the exercise of judicial power
by the division, and implicit in the decision is the conclusion
that the separation of governmental powers is observed. (See,
also, *Wood* v. *Pendola*, 1 Cal.2d 435, 442 [35 P.2d 526].)
In effect section 24 provides that the court may appoint the
division to act as an investigator and an expert witness, but
there is nothing which authorizes the courts to control or reg-
ulate, in any particular, the proper functions of the division
or the manner in which, pursuant to legislative mandate, it
shall proceed in conducting its examination and making its
report. The Fleming case also expressly held that section
24 is not unconstitutional and void as a special law providing
for a variation from the general practice and procedure in
the superior court in violation of article IV, section 25, of the
Constitution. (18 Cal.2d at p. 528; *cf., Wood* v. *Pendola*, 1
Cal.2d 435, 442 [35 P.2d 526].)

 There is no merit in the contention that the refer-
ence should have been made to the Department of Public
Works as the statutory successor of the Water Commission.
Since the abolition of the Water Commission in 1921, it has
been repeatedly recognized that, under section 24, the court
may properly refer a pending water rights case to the Divi-
sion of Water Resources or its predecessor, the Division of
Water Rights.* (*Fleming* v. *Bennett*, 18 Cal.2d 518, 521
[116 P.2d 442]; *Rancho Santa Margarita* v. *Vail*, 11 Cal.2d
501, 559 [81 P.2d 533]; *City of Lodi* v. *East Bay Mun. Utility
Dist.*, 7 Cal.2d 316, 341 [60 P.2d 439]; *Tulare Irr. Dist.* v.

---

*Compare Water Code, sections 22, 2000, 2001,

*Lindsay-Strathmore Irr. Dist.*, 3 Cal.2d 489, 575 [45 P.2d 972, 1014] ; *Peabody* v. *City of Vallejo*, 2 Cal.2d 351, 373 [40 P.2d 486].)

■ The complaint is made that some of the men who worked on the report of the referee were not available for cross-examination at the time of the trial. It appears, however, that the man who prepared the report and supervised the investigation testified at length and that others who worked on the report also testified at the trial. Appellant was afforded ample opportunity to examine these witnesses, and there is no showing that it sought to obtain the testimony of persons who were not present. It was permitted to introduce evidence contrary to the facts appearing in the report, and, under all the circumstances, there was no denial of an opportunity to be heard in opposition to the report.

■ Appellant claims that the trial court improperly enlarged the scope of the proceedings. In response to a request of the referee for instructions, the court, after a hearing, ruled that the issues should "embrace an adjudication of rights of the defendants *inter se* and the rights of each and every party as against each and every other party." Although the answers of the respective defendants did not present claims against the other defendants and were not served on them, the action was tried on the theory that these matters were at issue, and the ensuing judgment limiting the amount of water that each could pump was also based on this theory. The trial court has authority, under section 24, to include, in the matters which are to be submitted to the referee and determined by the judgment, any issues necessary to a proper determination of the controversy. (See *Fleming* v. *Bennett*, 18 Cal.2d 518, 523 [116 P.2d 442].) It was within the discretion of the trial court to determine whether it was necessary to adjudicate *inter se* the amount of water to which each party was entitled, and the record indicates that it would have been impracticable to decide the matter solely between plaintiff and each defendant. ■ Moreover, appellant had ample time to prepare its case after notice of the scope of the proceedings, and there is no basis for any claim that it was misled to its prejudice or that it was denied due process of law.

■ The objection is also made that the court erred in allocating water without the joinder of a number of private users who pumped comparatively small amounts. The referee filed a preliminary report which stated that it would be impracticable to attempt to include all such parties. It rec-

ommended, however, that certain named parties who used fairly substantial amounts be joined in the action, and the court ordered them brought in over the objections of appellant. No request was made by appellant for the inclusion of any party who had not been joined, and there is no showing that its interest was injuriously affected by the failure to require the joinder of all possible claimants. (See *Smith* v. *Cucamonga Water Co.*, 160 Cal. 611, 617 [117 P. 764].) The line must be drawn somewhere in order to bring the proceeding within practical bounds, and it would have been impossible to reach a solution of the problems involved and to render a valid judgment if jurisdiction to make an allocation depended upon the joinder of every person having some actual or potential right to the water in the basin and its sources of supply. The persons not made parties are, of course, not bound by the judgment, nor are they injured by the injunction.

Appellant further contends that it cannot be enjoined since the water which it produces is devoted to a public use. Reliance is placed upon cases holding that when a public use has attached, inverse condemnation proceedings may be invoked and compensation in lieu of a prohibitory injunction is preferred in most circumstances. (See *Hillside Water Co.* v. *Los Angeles,* 10 Cal.2d 677, 688 [76 P.2d 681]; *Peabody* v. *City of Vallejo,* 2 Cal.2d 351, 377-380 [40 P.2d 486]; *Newport* v. *Temescal Water Co.,* 149 Cal. 531, 538 [87 P. 372, 6 L.R.A.N.S. 1098].) This rule has its foundation chiefly in the inconvenience to the public if service is interrupted by the issuance of an injunction to restrain the use (*Miller & Lux* v. *San Joaquin L. & P. Corp.,* 8 Cal.2d 427, 436 [65 P.2d 1289]; *Burr* v. *Maclay Rancho Water Co.,* 160 Cal. 268, 280 [116 P. 715]), and has no application to the problem which confronts us here. The purpose of this litigation is the protection of the interests of both public and private users by preventing further depletion of the water supply. Excepting appellant, all parties, public as well as private, have consented to be enjoined to effect this purpose. There is nothing in the record to indicate that the public interest would be better served by depriving private users of their pumping rights and compensating them therefor. If this were done they would have to purchase their water from municipalities or public utilities which take water from the same underground area, and the total supply available to the public would not be increased. Moreover, it would be exceedingly

difficult to fix the monetary loss of each private party and then apportion it among the numerous public users. In these circumstances, the trial court was justified in concluding that the rule against enjoining public utilities was not applicable.

## FINDINGS AND JUDGMENT

The Raymond Basin Area, a field of ground water located at the northwest end of San Gabriel Valley, includes the city of Sierra Madre, almost all of the city of Pasadena, and portions of South Pasadena, San Marino, and Arcadia. The field of ground water contains alluvium consisting of sands, gravels and other porous materials through which water percolates. The northern side is formed by the San Gabriel range of mountains which rise back of the valley to a general elevation of from 5,000 to 6,000 feet. The area comprises 40 square miles and is separated from the rest of the valley along its southern boundary by the Raymond Fault, sometimes known as Raymond Dike, a natural fault in the bedrock constituting a "Barrier in the alluvium . . . which greatly impedes the sub-surface movement of water from the area, although it does not entirely stop it, thus creating a vast underground storage reservoir." There is a pronounced slope to the south from elevations of 1,000 feet above sea level at the mountains to a general elevation of 500 to 700 feet at Raymond Fault.

In this part of the state there is ordinarily a series of wet years followed by a number of dry years, making it necessary during periods of above-normal rainfall to store water for future use. It appears, however, that the ground water storage capacity is adequate to store the excess during wet years for the following dry years.

Natural underground formations divide the area into two practically separate units. The Western Unit, the larger of the two, consists of the Monk Hill Basin, which is to the northwest, and the Pasadena Subarea. The Eastern Unit, or Santa Anita Subarea, lies immediately to the east of the Pasadena Subarea. At the present water table elevations movement of ground water from the Western to the Eastern Unit is so small as to be immaterial but it might be increased by an overdraft in the Eastern Unit. Movement from the Eastern to the Western Unit is almost totally lacking.

Our concern is with the Western Unit where the principal ground water movement is from north and west of Monk Hill to the south and east and across Raymond Fault. The water

in this unit is replenished by rainfall, by return water arising from the use of water in the unit, and by the runoff and underflow from the San Gabriel Mountains to the north and from the San Rafael hills to the west. Appellant's wells, from which it obtains all its production, are in the southeastern part of this unit, and the underlying water constitutes one ground water body which is a common source of all parties taking water therefrom. The water pumped from the ground in the Western Unit has exceeded the safe yield thereof in every year since 1913-14 (commencing October 1) except during the years 1934-35 and 1936-37. The safe yield of the unit was found to be 18,000 acre feet per year, but the average annual draft was 24,000 acre feet, resulting in an average annual overdraft of 6,000 feet.

With respect to the water rights acquired by the various parties it was stipulated by all of them, including appellant, that "all of the water taken by each of the parties to this stipulation and agreement, at the time it was taken, was taken openly, notoriously and under a claim of right, which claim of right was continuously and uninterruptedly asserted by it to be and was adverse to any and all claims of each and all of the other parties joining herein."

The findings set forth in terms of acre feet per year "the highest continuous production of water for beneficial use in any five (5) year period prior to the filing of the complaint by each of the parties in each of said units, as to which there has been no cessation of use by it during any subsequent continuous five (5) year period." This was designated, for convenience, the "present unadjusted right" of each party, and the court concluded that each party owned "by prescription" the right to take a certain specified amount of water, and that the rights of the parties were of equal priority. The total of the unadjusted rights for the Western Unit was found to be 25,608 acre feet per year, and water pumped by nonparties to the action was 340 acre feet per year. The court also found that a continued draft in these amounts will result in an unreasonable depletion and the eventual destruction of the ground water as a source of supply; that any increase in the amounts taken in the Eastern Unit will deplete the ground water supply in that unit; that in order to protect the supply it is necessary that the parties in the Western Unit be limited by reducing the "present unadjusted right of each such party in the proportion that the safe yield of said unit, less the water taken therein by nonparties hereto, bears to the aggre-

gate of such rights of parties hereto in said unit, and that each of the parties pumping or otherwise taking water from the ground in the Eastern Unit be limited to the amount of its present unadjusted right.'' The amount of water limited to each party, designated the ''decreed right,'' was set out in the findings, and this allocation gave each party about two-thirds of the amount it had been pumping.

The court enjoined all pumping in excess of the decreed right and appointed a ''Water Master'' to enforce the provisions of the judgment. It reserved jurisdiction to modify the judgment or make such further orders as might be necessary for adequate enforcement or for protection of the waters in the Raymond Basin Area from contamination.

### SUFFICIENCY OF EVIDENCE

Appellant takes the position that the ground water in the Western Unit is not contained in a single storage basin or reservoir as found by the court, but, rather, flows in certain defined underground streams from the northwestern portion to the southeastern section in much the same manner as water flows in surface streams, and that these streams, together with a flow of water from the Eastern Unit, converge at the lower level where appellant's wells are located. It argues that its taking of water cannot possibly injure the upper claimants because once the water has reached a lower level it cannot flow back upstream to the wells of the other parties.

The report states that no substantial quantity of water from the Eastern Unit now reaches appellant's wells. It also indicates that the ground water of the Western Unit is analogous to water stored in a large lake or reservoir, through which several currents slowly flow from inlet to outlet. Raymond Fault is similar to a dam in that it impedes the movement of water and backs it up over a considerable area, and pumping tests established that when the water table was lowered in one well, the effect could be measured in wells almost 2 miles away. These tests were conducted over comparatively short periods of time, the greatest being about three days, and since the water moves very slowly through the alluvium, it could be inferred that the effect would have been much more widespread if the test-pumping had been continued for a longer time.

There is nothing in the record which would compel a finding that the difference in elevation between the Monk Hill Basin and the Pasadena Subarea is so great that wells in the

northwest will be entirely unaffected by long-continued excessive pumping elsewhere in the unit. Moreover, as the referee points out, the serious overdraft is in the area where appellant takes its water, and its pumping directly reduces the supply where water is most needed. The record shows that in view of the smaller overdraft in the Monk Hill Basin the parties situated there suffered a greater ratable cut under the injunction than persons in the Pasadena Subarea, and that appellant has been helped rather than injured by inclusion of the Monk Hill Basin as part of the underground storage area.

Appellant contends that the safe yield was greatly understated, and that there was little, if any, overdraft. Eighteen thousand acre feet per year was found to be the safe yield in the Western Unit, and this figure was based upon the report of the referee which calculated the amount from changes in the water stored underground and in the water table elevation as compared with the amount of water extracted by pumping. It is asserted that the referee failed to measure and include the underflow from the San Gabriel Mountains and the waters conserved upon the surface by artificial means. All sources of underground water, however, were automatically included by the method of calculation employed by the referee, and it was not necessary to make the specific measurements mentioned by appellant. Moreover, it is obvious from many statements in the report that surface conservation and underflow were given full consideration by the referee.

### The Main Issue

There can be no question that the trial court had authority to limit the taking of ground water for the purpose of protecting the supply and preventing a permanent undue lowering of the water table. (*Burr* v. *Maclay Rancho Water Co.*, 154 Cal. 428, 438 [98 P. 260]; *City of San Bernardino* v. *City of Riverside*, 186 Cal. 7, 16 [198 P. 784]; *cf., Allen* v. *California Water & Tel. Co.*, 29 Cal.2d 466, 485-486 [176 P.2d 8].) The main problems presented are which of the parties should bear the burden of curtailing the total production of the unit to the safe yield and what proportion, if any, of the pumping by each particular party should be restricted. Since the stipulation made by the other parties as to the reduction in pumping by each is not binding upon appellant, it is necessary to determine appellant's rights in relation to the other producers in the same manner as if there had been no agreement.

The question of who shall bear the burden of curtailing the overdraft, and in what proportion, depends upon the legal nature and status of the particular water right held by each party. Rights in water in an underground basin, so far as pertinent here, are classified as overlying, appropriative, and prescriptive. ▮ Generally speaking, an overlying right, analogous to that of a riparian owner in a surface stream, is the right of the owner of the land to take water from the ground underneath for use on his land within the basin or watershed; the right is based on ownership of the land and is appurtenant thereto. (See *Hillside Water Co.* v. *Los Angeles*, 10 Cal.2d 677, 686 [76 P.2d 681]; *Miller* v. *Bay Cities Water Co.*, 157 Cal. 256, 279-280 [107 P. 115, 27 L.R.A.N.S. 772]; 26 Cal.Jur. 271-277; 2 Wiel, Water Rights [3d ed., 1911], §§ 1100-1105, pp. 1040-1045.) ▮ The right of an appropriator depends upon an actual taking of water. (See 26 Cal.Jur. 277.) The term "appropriation" is said by some authorities to be properly used only with reference to the taking of water from a surface stream on public land for non-riparian purposes. (See Wiel, Water Rights [3d ed., 1911] §§ 228, 1107, 1158, 1159, and § 231 in the "reprint ed." of the 3d ed.; Farnham, Waters and Water Rights [1904] § 672a; 56 Am.Jur. 599.) The California courts, however, use the term to refer to any taking of water for other than riparian or overlying uses. (*City of San Bernardino* v. *City of Riverside*, 186 Cal. 7, 13-14 [198 P. 784]; *Burr* v. *Maclay Rancho Water Co.*, 154 Cal. 428, 436 [98 P. 260]; *Katz* v. *Walkinshaw*, 141 Cal. 116, 135 [70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236]; see 26 Cal.Jur. 273-274.) Where a taking is wrongful, it may ripen into a prescriptive right.

▮ Although the law at one time was otherwise, it is now clear that an overlying owner or any other person having a legal right to surface or ground water may take only such amount as he reasonably needs for beneficial purposes. (*Katz* v. *Walkinshaw*, 141 Cal. 116 [70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236]; *Peabody* v. *City of Vallejo*, 2 Cal.2d 351 [40 P.2d 486]; Cal. Const., art. XIV, § 3.) ▮ Public interest requires that there be the greatest number of beneficial uses which the supply can yield, and water may be appropriated for beneficial uses subject to the rights of those who have a lawful priority. (*Peabody* v. *City of Vallejo*, 2 Cal.2d 351, 368 [40 P.2d 486].) Any water not needed for the reasonable beneficial uses of those having prior rights is excess or surplus water. ▮ In California sur-

plus water may rightfully be appropriated on privately owned land for nonoverlying uses, such as devotion to a public use or exportation beyond the basin or watershed. (*Peabody* v. *City of Vallejo*, 2 Cal.2d 351, 368-369 [40 P.2d 486]; *City of San Bernardino* v. *City of Riverside*, 186 Cal. 7, 29, 30 [198 P. 784]; *Burr* v. *Maclay Rancho Water Co.*, 154 Cal. 428, 436 [98 P. 260]; *Katz* v. *Walkinshaw*, 141 Cal. 116, 135 [70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236]; see 26 Cal. Jur. 32 et seq., 273-274.)

It is the policy of the state to foster the beneficial use of water and discourage waste, and when there is a surplus, whether of surface or ground water, the holder of prior rights may not enjoin its appropriation. (*Peabody* v. *City of Vallejo*, 2 Cal.2d 351, 368-369, 372 [40 P.2d 486]; see 26 Cal. Jur. 277.) Proper overlying use, however, is paramount, and the right of an appropriator, being limited to the amount of the surplus, must yield to that of the overlying owner in the event of a shortage, unless the appropriator has gained prescriptive rights through the taking of nonsurplus waters.

As between overlying owners, the rights, like those of riparians, are correlative and are referred to as belonging to all in common; each may use only his reasonable share when water is insufficient to meet the needs of all. (*Katz* v. *Walkinshaw*, 141 Cal. 116 [70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236]; see 26 Cal.Jur. 269-273, 276; *cf.*, 25 Cal.Jur. 1063-1067.) As between appropriators, however, the one first in time is the first in right, and a prior appropriator is entitled to all the water he needs, up to the amount that he has taken in the past, before a subsequent appropriator may take any. (*City of San Bernardino* v. *City of Riverside*, 186 Cal. 7, 26-28 [198 P. 784]; *cf.*, Civ. Code, § 1414.)

Prescriptive rights are not acquired by the taking of surplus or excess water, since no injunction may issue against the taking and the appropriator may take the surplus without giving compensation; however, both overlying owners and appropriators are entitled to the protection of the courts against any substantial infringement of their rights in water which they reasonably and beneficially need. (*Peabody* v. *City of Vallejo*, 2 Cal.2d 351, 368-369, 374 [40 P.2d 486].) Accordingly, an appropriative taking of water which is not surplus is wrongful and may ripen into a prescriptive right where the use is actual, open and notorious, hostile and adverse to the original owner, continuous and uninterrupted for the statutory period of five years, and under

claim of right. (*City of San Bernardino* v. *City of Riverside,* 186 Cal. 7, 22-23 [198 P.784] ; *Katz* v. *Walkinshaw,* 141 Cal. 116, 135 [70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236] ; 25 Cal.Jur. 1178, 1157-1158; 1 Cal.Jur. 585; 26 Cal.Jur. 278-279; *cf., Wutchumna Water Co.* v. *Ragle,* 148 Cal. 759, 764-765 [84 P. 162].) To perfect a claim based upon prescription there must, of course, be conduct which constitutes an actual invasion of the former owner's rights so as to entitle him to bring an action. (*City of Los Angeles* v. *City of Glendale,* 23 Cal.2d 68, 79 [142 P.2d 289].) ▓▓▓ Appropriative and prescriptive rights to ground water, as well as the rights of an overlying owner, are subject to loss by adverse user. This is in accord with the rule announced in cases dealing with water in a surface stream. (See *Yankee Jim's Union Water Co.* v. *Crary,* 25 Cal. 504, 508-509 [85 Am.Dec. 145] ; *Big Rock M. W. Co.* v. *Valyermo Ranch Co.,* 78 Cal.App. 266, 273 [248 P. 264] ; *Peabody* v. *City of Vallejo,* 2 Cal.2d 351, 374 [40 P.2d 486] ; *Duckworth* v. *Watsonville etc. Co.,* 150 Cal. 520, 529-532 [89 P. 338] ; *Davis* v. *Gale,* 32 Cal. 26, 35 [91 Am.Dec. 554] ; 3 Farnham, Waters and Water Rights [1904], § 680a, p. 2106; 1 Wiel, Water Rights [3d ed., 1911], § 580, pp. 625-626; 56 Am.Jur. 773.)

▓▓▓ In the present case some of the parties, including owners of ranches, golf clubs, and cemeteries, have pumped water solely for use on their own land, and their rights at the outset were overlying. The principal takers of water, however, are public utility corporations and municipalities which have either exported water or have used it within the Western Unit for municipal purposes or for sale to the public, and their taking, when commenced, was entirely appropriative. (*City of San Bernardino* v. *City of Riverside,* 186 Cal. 7, 29 [198 P. 784] ; *Eden Township County Water Dist.* v. *Hayward,* 218 Cal. 634, 640 [24 P.2d 492].) Appellant exports about three-fourths of the water produced by it to customers located outside the area, and it claims overlying rights as to the· other one-fourth which it takes. As to the exported water it is clear that its rights could not be overlying in character, but are either appropriative or prescriptive.

It follows from the foregoing that, if no prescriptive rights had been acquired, the rights of the overlying owners would be paramount, and the rights of the appropriators would depend on priority of acquisition under the rule that the first appropriator in time is the first in right. The latest in time of the appropriations would then be the first to be curtailed

in limiting total production of the area to the safe yield. If such were the case, the overdraft could be eliminated simply by enjoining a part of the latest appropriations, since the record shows that there is ample water to satisfy the needs of all the overlying users and most of the appropriators, and appellant's appropriative rights would depend primarily upon evidence of priority in time of acquisition.

The principal dispute between appellant and respondents, however, concerns whether any water rights in the Western Unit have become prescriptive and, if so, to what extent. Respondents assert that the rights of all the parties, including both overlying users and appropriators, have become mutually prescriptive against all the other parties and, accordingly, that all rights are of equal standing, with none prior or paramount. Appellant, on the other hand, contends that in reality no prescriptive rights have been acquired, and that there has been no actionable invasion or injury of the right of any party using water because each party has been able to take all the water it needed and no party has in any manner prevented a taking of water by any other party. It would follow, under appellant's theory, that not even an overlying owner could have obtained an injunction against a subsequent taking.

We must look, therefore, to see if the disputed elements for a prescriptive right are shown by the record. Most of the factors are covered by the stipulation in which all the parties, including appellant, joined, namely, that ''all of the water taken by each of the parties to this stipulation and agreement was, at the time it was taken, taken openly, notoriously, and under a claim of right, which claim of right was continuously and uninterruptedly asserted by it to be and was adverse to any and all claims of each and all of the other parties joining herein.'' Two necessary elements are omitted: The length of the period over which the adverse user continued and the nature and extent of actual adverse user, if any.

The evidence clearly supports the finding which designates in terms of acre feet per year ''the highest continuous production of water for beneficial use in any five (5) year period prior to the filing of the complaint by each of the parties in each of said units, as to which there has been no cessation of use by it during any subsequent continuous five (5) year period.''

The record shows that there has been an actual adverse user of water in the Western Unit. There was an inva-

sion, to some extent at least, of the rights of both overlying owners and appropriators commencing in the year 1913-1914, when the overdraft first occurred. Each taking of water in excess of the safe yield, whether by subsequent appropriators or by increased use by prior appropriators, was wrongful and was an injury to the then existing owners of water rights, because the overdraft, from its very beginning, operated progressively to reduce the total available supply. Although no owner was immediately prevented from taking the water he needed, the report demonstrates that a continuation of the overdraft would eventually result in such a depletion of the supply stored in the underground basin that it would become inadequate. The injury thus did not involve an immediate disability to obtain water, but, rather, it consisted of the continual lowering of the level and gradual reducing of the total amount of stored water, the accumulated effect of which, after a period of years, would be to render the supply insufficient to meet the needs of the rightful owners.

The proper time to act in preserving the supply is when the overdraft commences, and the aid of the courts would come too late and be entirely inadequate if, as appellant seems to suggest, those who possess water rights could not commence legal proceedings until the supply was so greatly depleted that it actually became difficult or impossible to obtain water. Where the quantity withdrawn exceeds the average annual amount contributed by rainfall, it is manifest that the underground store will be gradually depleted and eventually exhausted, and, accordingly, in order to prevent such a catastrophe, it has been held proper to limit the total use by all consumers to an amount equal, as near as may be, to the average supply and to enjoin takings in such quantities or in such a manner as would destroy or endanger the underground source of water. (*City of San Bernardino* v. *City of Riverside*, 186 Cal. 7, 15-16 [198 P. 784]; *Burr* v. *Maclay Rancho Water Co.*, 154 Cal. 428, 438 [98 P. 260].) There is, therefore, no merit to the contention that the owners of water rights were not injured by the additional appropriations made after all surplus waters were taken, and they clearly were entitled to obtain injunctive relief to terminate all takings in excess of the surplus as soon as it became apparent from the lowering of the well levels that the underground basin would be depleted if the excessive pumping were continued.

The lowering of the water table resulting from the overdraft was plainly observable in the wells of the parties, and the records of water levels in appellant's own wells afford an excellent example of the yearly changes from about 1919 to 1937, when the complaint herein was filed. Using figures taken at about the same time each year to minimize the effect of seasonal variations, it appears that the surface of the water in appellant's well No. 1 was at an elevation of 559 feet above sea level in August, 1920, as compared with 485 feet in August, 1937, amounting to a drop of 74 feet. Appellant's well No. 4 was measured at the 570-foot level in August, 1920, and at 499 feet in September, 1937, a drop of 71 feet. Appellant's well No. 5 was at 553.1 feet in August, 1928, and at 514 feet in August, 1937, a drop of 39.1 feet in the shorter period of nine years. Well No. 6 was at the 542-foot level in August, 1919, at 568.2 feet in November, 1924, and at 515 feet in August, 1937, a net drop of 27 feet. Appellant's well No. 7 was at 565.2 feet in October, 1924, and at 484 feet in August, 1937, a drop of 81.2 feet. Well No. 8 has records only for 1937 and 1938, and there are no records for two other wells, Nos. 2 and 3, which appellant has apparently abandoned.

This evidence is clearly sufficient to justify charging appellant with notice that there was a deficiency rather than a surplus and that the appropriations causing the overdraft were invasions of the rights of overlying owners and prior appropriators. The elements of prescription being present in the record, the statute of limitations ran against the original lawful holders of water rights to whatever extent their rights were invaded.

It must next be determined whether the rights of all of the prior owners were invaded and whether all or only a part of the right of any particular owner was damaged. It has been established that the rights of appropriators as well as of overlying owners will be protected by the courts and that an invasion of either type of right will start the running of the statute. Where, as here, subsequent appropriators reduce the available supply and their acts, if continued, will render it impossible for the holder of a prior right to pump in the future, there is an enjoinable invasion. In this respect there is no difference between an overlying owner and an appropriator. Although neither may prevent a taking of surplus waters, either may institute legal proceedings to safeguard the supply once a surplus ceases to exist and may

enjoin any additional user beyond the point of safe yield.

Cases are cited for the proposition that an appropriator's rights are not invaded if he continues to receive the quantity of water to which he is entitled. These cases, however, do not deal with the problem of gradual depletion of water stored in a basin or lake, but, rather, with surface streams or ditches in which water flows but is not retained for future use. The type of injury there considered would immediately deprive the owner of water, and the language in the opinions does not apply to an invasion of rights in a stored supply of water to be used only in future years. (See *Faulkner* v. *Rondoni*, 104 Cal. 140, 147 [37 P. 883]; *Peck* v. *Howard*, 73 Cal.App.2d 308, 328 [167 P.2d 753]; *City of San Diego* v. *Cuyamaca Water Co.*, 209 Cal. 105, 133 [287 P. 475].)

 Neither the overlying owners nor the appropriators took steps to obtain the aid of the courts to protect their rights until the present action was instituted, many years after the commencement of the overdraft, and at first glance it would seem to follow that the parties who wrongfully appropriated water for a period of five years would acquire prior prescriptive rights to the full amount so taken. The running of the statute, however, can effectively be interrupted by self help on the part of the lawful owner of the property right involved. Unlike the situation with respect to a surface stream where a wrongful taking by an appropriator has the immediate effect of preventing the riparian owner from receiving water in the amount taken by the wrongdoer, the owners of water rights in the present case were not immediately prevented from taking water, and they in fact continued to pump whatever they needed. As we have seen, the Raymond Basin Area is similar to a large lake or reservoir, and water would be available until exhaustion of the supply. The owners were injured only with respect to their rights to continue to pump at some future date. The invasion was thus only a partial one, since it did not completely oust the original owners of water rights, and for the entire period both the original owners and the wrongdoers continued to pump all the water they needed.

The pumping by each group, however, actually interfered with the other group in that it produced an overdraft which would operate to make it impossible for all to continue at the same rate in the future. If the original owners of water rights had been ousted completely or had failed to pump for a five-year period, then there would have been no interference

whatsoever on the part of the owners with the use by the wrongdoers, and the wrongdoers would have perfected prior prescriptive rights to the full amount which they pumped. As we have seen, however, such was not the case, and, although the pumping of each party to this action continued without interruption, it necessarily interfered with the future possibility of pumping by each of the other parties by lowering the water level. The original owners by their own acts, although not by judicial assistance, thus retained or acquired a right to continue to take some water in the future. The wrongdoers also acquired prescriptive rights to continue to take water, but their rights were limited to the extent that the original owners retained or acquired rights by their pumping.

A partial analogy may be found in *Smith* v. *Hampshire,* 4 Cal.App. 8 [87 P. 224], where the appellant had constructed a ditch across the respondents' land and used it adversely for 10 years, but the respondents, for six years, had used a portion of the ditch jointly with but adversely to appellant. It was held that both had acquired rights in the ditch and that respondents' acts, being hostile to appellant's asserted claim of exclusive right, operated to conserve respondents' right to use the ditch. The court said (p. 11): "While respondents could not acquire a prescriptive right to a right of way over their own land, they could destroy appellant's claim of *exclusive* right by open, peaceable, notorious and continuous adverse use, and thus establish *their* right (as against his asserted, exclusive claim) to use the ditch themselves for a limited purpose and commingle their water with his in so doing."

We need not determine whether the overlying owners involved here retained simply a part of their original overlying rights or whether they obtained new prescriptive rights to use water. (See *Glatts* v. *Henson,* 31 Cal.2d 368, 371 [188 P.2d 745].) The question might become important in order to ascertain the rights of the parties in the event of possible future contingencies, but these may never happen.

 Adoption of appellant's position that the water must be allocated, at least as between the municipalities and public utility companies, strictly on the basis of priority in time of appropriation would not only ignore the fundamental principle that the statute of limitations runs against persons who fail to act when their rights are invaded, but it would result in an unequal sharing of the burden of curtailing the

overdraft in that all pumping conducted under authority of certain of the later appropriations would be completely eliminated, whereas no restriction in amount would be imposed upon pumping based on earlier appropriations. Such a result does not appear to be justified where all of the parties have been producing water from the underground basin for many years, and none of them have acted to protect the supply or prevent invasion of their rights until this proceeding was instituted. Moreover, it seems probable that the solution adopted by the trial court will promote the best interests of the public, because a *pro tanto* reduction of the amount of water devoted to each present use would normally be less disruptive than total elimination of some of the uses.

We hold, therefore, that prescriptive rights were established by appropriations made in the Western Unit subsequent to the commencement of the overdraft, that such rights were acquired against both overlying owners and prior appropriators, that the overlying owners and prior appropriators also obtained, or preserved, rights by reason of the water which they pumped, and that the trial court properly concluded that the production of water in the unit should be limited by a proportionate reduction in the amount which each party had taken throughout the statutory period.

### Other Contentions

The water allowed each party by the trial court was measured by the amount taken over a five-year period as to which there had been no cessation of use during any subsequent five-year period. Appellant argues that, in determining whether there had been a *loss of rights,* the court should have applied the shorter three-year limitation prescribed by section 20a of the Water Commission Act, which was in effect prior to 1943. (Deering's Gen. Laws (1937), Act 9091, § 20a, now Wat. Code, § 1241.) This section provided: "When the party entitled to the use of water fails to beneficially use all or any part of the water claimed by him, for which a right of use has vested, for the purpose for which it was appropriated or adjudicated, for a period of three years, such unused water shall revert to the public and shall be regarded as unappropriated public water." This section, however, is not applicable here. The primary purpose of the act was to create a system for issuing licenses and permits for appropriation of surplus water (see Deering's Gen. Laws (1937), Act 9091, §§ 1, 1d, 11, 15, 16), and it is

reasonably clear that section 20a was intended to refer only to water which had been appropriated under such a license or permit. Water in an underground basin is not embraced by the licensing system, because section 42 of the act provides that the term "water," as used in sections of the act relating to permits or licenses, "shall be interpreted to refer only to surface water, and to subterranean streams flowing through known and definite channels." (Deering's Gen. Laws (1937), Act 9091, § 42.) There is no claim that any of the rights to water involved in the present case were obtained under such a permit or license, and the ground water in the Raymond Basin Area does not flow in known and definite channels within the meaning of section 42.

In 1934, less than four years before the commencement of this action, the city of Pasadena began to take a quantity of water from the San Gabriel River, which is not a source of supply to the Raymond Basin Area. This diversion was terminated in 1941 as part of the settlement of litigation brought by users of water from the river. Appellant contends that when the city imported water from the San Gabriel River, it reduced the amount which it took from the underground basin and, therefore, that it is now barred by estoppel and laches from taking out of the basin more water than the maximum amount pumped during the period in which it used water from the river. The trial court found, however, that appellant was not induced to take any action by reason of the importation and that the city was not estopped. The finding is supported by the record and, accordingly, is conclusive on this appeal. The claim of laches is sufficiently answered by the failure to show prejudice and the fact that the time involved was less than five years prior to commencement of the action.

There is no merit to the assertion that, because of considerations of public policy, the city of Pasadena should be compelled to purchase some of its water from the Metropolitan Water District of Southern California instead of exercising its right to take water from the underground basin. Although the city has the right to purchase water from the district, it does not follow that the city should be compelled to do so in order to afford a larger supply to other parties.

The failure of the city of Pasadena to capture and return to the underground basin storm waters and waters used to flush streets, fight fires, and flow sewage does not, as claimed by appellant, constitute waste in violation of sec-

tion 3 of article XIV of the California Constitution. Storm drains used for flood control carried some water outside the area, but this does not mean it was wasted, and there is no evidence that there was any waste in connection with the use of water in ordinary and necessary municipal activities.

A water exchange agreement, enforced by the judgment but not signed by appellant, provided that the city of Pasadena should restrict its pumping in the Monk Hill Basin and take the remainder of its share of water from elsewhere in the Western Unit. Appellant cannot properly complain of this provision unless it is injured thereby, and it could not be damaged unless the city pumped water in such quantities in the immediate vicinity of appellant's wells as to render it difficult or impossible for appellant to obtain the amount of water to which it is entitled. No reasonable likelihood of such an occurrence is shown, but, in the event that such a local shortage should take place, appellant may obtain relief under that portion of the judgment reserving jurisdiction to make such modifications as may become necessary.

It is next argued that the injunction should not have limited appellant to a fixed number of acre feet of water a year but, rather, that unrestricted pumping should be allowed so long as the water in the wells is above some specified level. Although this might be a proper method of safeguarding the supply of water in the underground basin, there is nothing in the record which compels a finding that the method of conservation adopted by the trial court is improper or that it would result in an undue raising of the water table. Moreover, ample protection against such a danger is afforded by the provisions of the decree reserving jurisdiction in the trial court to modify the judgment and requiring the water master to keep monthly recordings of the depth of water in all wells.

The court did not err in refusing to admit evidence offered to rebut the report of the referee with respect to appellant's water production from 1931 to the end of 1938. Section 24 of the Water Commission Act provides that "[N]o exception shall be considered except in the court's discretion, or for some good cause shown, unless it shall appear that the matter of the exception had theretofore been presented to the commission in the form of an objection." (Cf., Wat. Code, §§ 2017-2019.) Appellant did not comply with this requirement and showed no good reason why it did not do so.

All parties except appellant stipulated that each of them who had diverted water from streams leading to the underground basin should be restricted to an amount measured by the maximum capacity of its diversion works "as the same existed at any time within five (5) years prior to October 1, 1937," which was approximately one week after commencement of the action. Pursuant to this stipulation the court concluded that each of these diverters had the right to take this amount as against all parties other than appellant, but enjoined any increase in the amount to be taken and expressly stated that it was making no determination as to the existence of such rights as against appellant. It is argued that, before any injunction was issued, the court should have determined appellant's rights as against the parties diverting from streams leading to the underground basin. The issue, however, was not clearly raised in the pleadings, and there was not sufficient evidence in the record to enable the court to make a determination as to the priority of rights or as to the effect of these diversions upon the safe yield in the basin. In view of the necessity of securing a present solution for the critical situation in the basin area, the court was justified in leaving open for future determination the rights of appellant as against all such diversioners, some of whom were not made parties to the action.

The court reserved jurisdiction, among other things, to review its determination of the safe yield of the Raymond Basin Area and the rights of all the parties as affected by the abandonment or forfeiture of any right. The reservation specifies that "in the event material change be found or any such abandonment or forfeiture be established" the court can "adjudicate that the decreed right of each party to pump or otherwise take water from the ground in the Raymond Basin Area shall be changed proportionately in the same manner as originally fixed herein. . . ." Review of the safe yield was to be had "not more frequently than at five (5) year intervals." Appellant concedes that the court would have power to retain jurisdiction to readjust the rights of the parties in accordance with the law and the facts as they may be at the time, but it asserts that the court went beyond its authority and decreed as to rights which may be attained in the future insofar as it reserved jurisdiction to pass upon abandoned or forfeited waters and provided that the right of each party should be altered proportionately in the event of any material change or abandonment. The five-year limi-

tation upon redetermination of the safe yield is also challenged by appellant.

The retention of jurisdiction to meet future problems and changing conditions is recognized as an appropriate method of carrying out the policy of the state to utilize all water available. (*Allen* v. *California Water & Tel. Co.*, 29 Cal.2d 466, 488 [176 P.2d 8] ; *City of Los Angeles* v. *City of Glendale*, 23 Cal.2d 68, 81 [142 P.2d 289].)

In the present case, the trial court concluded that each party owned "by prescription" its "present unadjusted right," that is, the amount which it had been actually pumping. The effect of the judgment is to decree that, while the parties have this present right, it is necessary, in order to conserve the basin and preserve the rights of all parties, to limit the takings to the amount of the safe yield and therefore to make a *pro tanto* or proportionate reduction in the amount which each can be permitted to pump until such time as conditions warrant an increase. This solution of the problem recognizes that the original owners have some rights to continue to pump in the future, that at the same time certain prescriptive rights have ripened on the basis of appropriations made after the overdraft commenced, and that the rights of each of the parties are measured by the amounts of the respective takings. Under such circumstances, it is proper to provide that, if the amount of the safe yield is increased, the permissible takings shall be increased proportionately up to the amount of the "present unadjusted right" of each party. The adjudication thus applies to existing rights, and there is no declaration as to future rights in water to which a party has no present right. Accordingly, the action of the court is not in conflict with the statement in *City of San Bernardino* v. *City of Riverside*, 186 Cal. 7 at pages 30-31 [198 P. 784], to the effect that a court should not undertake to make a declaration as to future rights.

We are of the opinion, however, that the five-year limitation upon the power to review the determination of safe yield tends to defeat the purpose of the rule giving the trial court continual supervisory powers in water rights cases, and that the judgment should be modified to preserve a broad retention of jurisdiction in the trial court to change its decree and orders, after notice and hearing, as the occasion may require. Paragraph XXI of the judgment is, therefore, modified by striking therefrom the following provision: "and that the review of its determination of the safe yield of either

or both of said units of the Raymond Basin Area shall be had not more frequently than at five (5) year intervals after the date hereof.''

As so modified, the judgment is affirmed, respondents to recover costs on appeal.

Shenk, J., Edmonds, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I dissent.

While the issues in this case are limited to the rights of overlying land owners and appropriators of underground percolating waters, the majority opinion purports to cover a much wider range in its pronouncements in the field of water law. Any student in this branch of our law must be impressed with the hodge-podge of conflicting rules and principles enunciated in the various decisions of this court and the District Courts of Appeal, particularly during the past two or three decades, and the majority opinion in this case simply adds to the confused state of affairs. Having had a somewhat limited experience in the trial of cases involving principles of water law, I have had the urge for some time to prepare a symposium of the decisions of our courts in recent years, which, to my mind, leaves this branch of our law in a state of hopeless confusion. However, I do not consider this case a proper vehicle in which to undertake this work and I shall await a more propitious occasion.

In view of the limited issues here involved, all discussion relating to water rights in surface streams and lakes has no relevancy to the problems here involved. At the beginning of the majority opinion, the issues here presented are correctly stated as follows: ''The principal issues presented on this appeal are whether the trial court properly limited the amount of water that appellant may take from the ground in the Raymond Basin Area, and whether it erred in placing the burden of curtailing the overdraft proportionately on all parties.'' Then follows a discussion of ''Preliminary Contentions'' relative to dismissal of the action and reference to the Division of Water Resources. I am disposed to agree that if the case were properly referred to the division, appellant was not entitled to have the case dismissed. However, if this were a case of first impression, I would be disposed to agree with the appellant's contention that the scope and effect of the reference here made was a violation of the judicial

process. But it is apparent from the recent decisions of this court that virtual abdication of the judicial process of the courts in favor of the administrative process of the division has not only been sanctioned, but has been imposed by this court upon the trial courts in cases of this character. Of the wisdom of such imposition I have grave doubt. I can see no objection, however, to a trial court availing itself of the investigating facilities of the division and making use of the data thus obtained in the solution of problems of this character, but I am unqualifiedly opposed to the view expressed in some of the decisions of this court relative to the infallibility of the division, and the necessity that trial courts refer every case involving problems relating to water rights to the division and accept its determination of all questions of both fact and law. I am convinced from an examination of the record in this case that that is just what the trial court did in determining the rights of the parties to this action. It is obvious that principles of water law were disregarded, that the division made a determination based upon the quantity of water available and the requirements of the respective parties, and divided the water accordingly, regardless of prior appropriations, prescriptive rights, or rights of overlying owners. They accomplish this unique result by evolving a new and novel theory of each user acquiring a right against the other by prescription or adverse use, thus destroying all priorities and placing each user upon an equal footing with the other, regardless of the time of origin or bases of his right. This is certainly a "new look" in the field of water law. We have indeed come a long way from the rugged individualism of the riparian right "rocking chair" doctrine as expounded in *Lux* v. *Haggin*, 69 Cal. 255 [4 P. 919, 10 P. 674]; *Alta Land etc. Co.* v. *Hancock*, 85 Cal. 219 [24 P. 645, 20 Am.St. Rep. 217]; *Southern Cal. Inv. Co.* v. *Wilshire*, 144 Cal. 68 [77 P. 767]; *Montecito Valley W. Co.* v. *Santa Barbara*, 144 Cal. 578 [77 P. 1113]; *Anaheim Union Water Co.* v. *Fuller*, 150 Cal. 327 [88 P. 978, 11 L.R.A.N.S. 1062]; *Huffner* v. *Sawday*, 153 Cal. 86 [94 P. 424]; *San Joaquin etc. Co.* v. *Fresno Flume Co.*, 158 Cal. 626 [112 P. 182, 35 L.R.A.N.S. 832]; *Miller & Lux Inc.* v. *J. G. James Co.*, 179 Cal. 689 [178 P. 716]; *Oliver* v. *Robnett*, 190 Cal. 51 [210 P. 408]; *Pabst* v. *Finmand*, 190 Cal. 124 [211 P. 11]; *Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81 [252 P. 607]; *Fall River V. Irr. Dist.* v. *Mt. Shasta P. Corp.*, 202 Cal. 56 [259 P. 444, 56 A.L.R. 264]; *Miller & Lux Inc.* v. *Enterprise*

*etc. Co.*, 169 Cal. 415 [147 P. 567]; *Morgan* v. *Walker*, 217 Cal. 607 [20 P.2d 660]; *Moore* v. *California Oregon Power Co.*, 22 Cal.2d 725 [140 P.2d 798]; *Skelly* v. *Cowell*, 37 Cal. App. 215 [173 P. 609]; *Stepp* v. *Williams*, 52 Cal.App. 237 [198 P. 661]; *Mt. Shasta Power Corp.* v. *McArthur*, 109 Cal. App. 171 [292 P. 549]; *California Pastoral & A. Co.* v. *Enterprise C. & L. Co.*, 127 F. 741, and other cases; and the doctrine of prior appropriation, as expounded in *Osgood* v. *El Dorado Water etc. Co.*, 56 Cal. 571; *Burrows* v. *Burrows*, 82 Cal. 564 [23 P. 146]; *De Necochea* v. *Curtis*, 80 Cal. 397 [20 P. 563, 22 P. 198]; *Duckworth* v. *Watsonville W. etc. Co.*, 158 Cal. 206 [110 P. 927]; *Haight* v. *Costanich*, 184 Cal. 426 [194 P. 26]; *Joerger* v. *Pacific Gas & Electric Co.*, 207 Cal. 8 [276 P. 1017]; *Jennison* v. *Kirk*, 98 U.S. 453 [25 L.Ed. 240]; *Telluride Power T. Co.* v. *Rio Grande etc. Ry. Co.*, 175 U.S. 639 [20 S.Ct. 245, 44 L.Ed. 305]; and also the doctrine of prescriptive rights, as expounded in *Alta Land etc. Co.* v. *Hancock*, 85 Cal. 219 [24 P. 645, 20 Am.St.Rep. 217]; *Southern Cal. Inv. Co.* v. *Wilshire*, 144 Cal. 68 [77 P. 767]; *Anaheim Union Water Co.* v. *Fuller*, 150 Cal. 327 [88 P. 978, 11 L.R.A.N.S. 1062]; *Oliver* v. *Robnett*, 190 Cal. 51 [210 P. 408]; *Pabst* v. *Finmand*, 190 Cal. 124 [211 P. 11]; *Morgan* v. *Walker*, 217 Cal. 607 [20 P.2d 660]; *Moore* v. *California Oregon Power Co.*, 22 Cal.2d 725 [140 P.2d 798]; *Skelly* v. *Cowell*, 37 Cal.App. 215 [173 P. 609]; *Stepp* v. *Williams*, 52 Cal.App. 237 [198 P. 661]; *Mt. Shasta Power Corp.* v. *McArthur*, 109 Cal.App. 171 [292 P. 549]. If it may be said that the doctrine of those cases was based upon a philosophy of "rugged individualism," I would say that the doctrine laid down in the majority opinion in the case at bar is based upon the philosophy of bureaucratic communism. Under this latter doctrine, long established, and what was thought to be, a prior, vested right to divert and use a given quantity of water is not only placed upon a parity with later acquired rights, but an administrative agency of the state steps in and administers the distribution of such water at the expense of the users. This may not be the type of obnoxious stateism which exists in many other countries, but it is certainly a very definite step in that direction. As one who believes in the concept embraced within both the federal and state Constitutions that an owner of private property has the right to exercise ownership and control over it and make such use of it as he may see fit so long as he causes no injury to others thereby, I am opposed to state supervision and control of

privately owned water rights, as well as other privately owned property. I know of no reason, and none has been suggested, why parties engaged in water litigation may not prepare and present evidence in support of their rights with as much probative value as that obtained by the Division of Water Resources.

The record discloses that in 1911, appellant purchased 171 acres immediately north of Raymond Fault. Appellant retains only a few parcels (about 10%) of the original 171 acres. In every conveyance made, appellant reserved all water rights. One-fourth of appellant's production has been used for beneficial uses on the 171 acres of overlying land in Raymond Basin Area and three-fourths has been exported for use outside of this area on nonoverlying lands. By the end of the 1918-19 season, appellant's minimum annual extractions, extending over a period of five consecutive years, amounted to 370 acre feet of water. Before that, its production was 337 acre feet. Three-fourths of its maintained extraction, or 284.25 acre feet, represent prescriptive rights; that is, water diverted from the basin and used on nonoverlying lands. The remainder of the water produced was used on its overlying lands in the basin. During the 1923-24 season, appellant produced on its lands 403 acre feet and exported three-fourths of this quantity. Between the last mentioned season and the 1928-29 season, appellant produced 521 acre feet per annum, of which 118 acre feet was new production which had matured since 1919. Of this new production, 29.50 acre feet was used on overlying lands and 88.50 acre feet represent a new prescriptive right acquired during this period. Appellant claims, and the evidence appears to sustain its position, that by the 1933-34 season, it had acquired a prescriptive right to divert and use from its lands overlying Raymond Basin 390.75 acre feet, and 130.25 acre feet for overlying uses on said land, or a total of 521 acre feet per annum. Appellant's production from said land since the filing of the complaint is as follows: 1938—613.12 acre feet; 1939—618.73 acre feet; 1940—626.06 acre feet; 1941—578.88 acre feet; 1942—701.30 acre feet; 1943—866.60 acre feet. By the decree in this action, appellant's production from said land for all purposes was determined to be 521 acre feet per annum which quantity was classified as appellant's unadjusted right. The decree, however, limited appellant's total diversion to 359 acre feet per annum for all purposes. In arriving at the foregoing conclusion, the trial court determined as a

matter of law that all of the rights of the parties are of equal priority and of the same legal force and effect; that each of the parties had acquired a prescriptive right against the other for the quantity of water which the court determined that each of said parties was entitled to divert and use, and no distinction was made between the rights of overlying owners and rights acquired by appropriation or prescription.

I am disposed to agree with counsel for appellant that "One would search the books a long, long time before any law could be found that overlying owners' rights can be put into a hopper and come out appropriative or prescriptive rights, or that appropriative or prescriptive rights are co-equal with overlying owners' rights." I am sure that no cases can be found, even in the confused and muddled state of our water law which give support to such an absurd pronouncement.

In California, one may acquire rights in underground water by appropriation or prescription. Such right, when established, is paramount to that of the overlying owner. (*Burr* v. *Maclay Rancho Water Co.*, 154 Cal. 428 [98 P. 260]; *Katz* v. *Walkinshaw*, 141 Cal. 116 [70 P. 663, 74 P. 766, 99 Am.St. Rep. 35, 64 L.R.A. 236]; *San Bernardino* v. *Riverside*, 186 Cal. 7 [198 P. 784]; *Peabody* v. *City of Vallejo*, 2 Cal.2d 351 [40 P.2d 486].)

There are, in this case, two types of water rights involved—those of the overlying owners, and those of the nonoverlying owners. While I think the term "appropriator" is correctly used only with respect to those persons who acquired water rights prior to the time the lands of other overlying owners were granted by the United States government, in the interest of promoting an understanding of this dissent, in conjunction with the majority opinion, I shall use the term as meaning a nonoverlying owner—in other words, one who has acquired water rights for use other than on land overlying the underground water supply.

Inherent in the opinion as set forth in *Katz* v. *Walkinshaw*, 141 Cal. 116 [70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236], is the doctrine of correlative rights. It appears that this doctrine seeks to assimiliate the law of streams—the analogy of riparian rights—to that of underground waters when used on overlying lands; as to nonoverlying use, the analogy of rights by appropriation is in operation.

In 1928, a new section [art. XIV, § 3] was added to our Constitution. This section was designed to prevent waste of the waters of our state, and was added in the interests of the

public welfare. The section reads in part as follows: "The right to water or to use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; *provided, however,* that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, *or of depriving any appropriator of water to which he is lawfully entitled.* This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained." [Emphasis added.]

Evidently the first time the above quoted constitutional provision was considered by this court was in the case of *Gin S. Chow* v. *City of Santa Barbara,* 217 Cal. 673 [22 P.2d 5]. That case involved the Santa Barbara River, and decided that stream waters not being put to a beneficial use by a riparian owner could be appropriated, and the old law of vested riparian rights was supposedly overruled and obliterated by the 1928 constitutional amendment. In the light of certain language contained in said amendment, such a construction appears to me to be unwarranted. Those words are these: "Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, *or may be made adaptable,* in view of such reasonable and beneficial uses; . . . provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which his land is riparian under reasonable methods of diversion and use, *or of depriving any appropriator of water to which he is lawfully entitled.*" (Italics added.)

There is nothing in the above quoted constitutional provision which should be construed as preventing an appropriator from acquiring a prescriptive right to the water he has used beneficially for the prescriptive period. If the appropriator is using water which the riparian may need in the

future to irrigate his land, then the riparian should be required to ask for a declaratory judgment in order that such water may be available to him when he does need it. This would prevent waste, and would be in line with the language contained in the constitutional amendment. It would also have the added advantage of letting the appropriator know where he stands and what he may expect. Under the present rule, an appropriator may use water, incur obligations, etc., and then, later, when the riparian owner desires to use water, have his rights taken from him. Such a state of affairs would bring on far more chaos than the "old rocking chair" doctrine was capable of doing.

The majority purport to expound rules relative to surplus or excess water, but admittedly there is no water answering such a classification in this case. The majority opinion states: "Prescriptive rights are not acquired by the taking of surplus or excess water, since no injunction may issue against the taking and the appropriator may take the surplus without giving compensation. . . ." What the majority mean by the phrase "surplus or excess water" is not clear. If it is meant that so long as there is water available for those who desire to use it, any additional water is "surplus or excess water," then the above pronouncement is directly contrary to the following cases: *Butte Canal & Ditch Co.* v. *Vaughn*, 11 Cal. 143 [70 Am.Dec. 769]; *Ortman* v. *Dixon*, 13 Cal. 33; *Kidd* v. *Laird*, 15 Cal. 161 [76 Am.Dec. 472]; *Stein Canal Co.* v. *Kern I. I. C. Co.*, 53 Cal. 563; *Lux* v. *Haggin*, 69 Cal. 255 [4 P. 919, 10 P. 674]; *Alta Land etc. Co.* v. *Hancock*, 85 Cal. 219 [24 P. 645, 20 Am.St.Rep. 217]; *Southern Cal. Inv. Co.* v. *Wilshire*, 144 Cal. 68 [77 P. 767]; *Montecito Valley W. Co.* v. *Santa Barbara*, 144 Cal. 578 [77 P. 1113]; *Anaheim Union Water Co.* v. *Fuller*, 150 Cal. 327 [88 P. 978, 11 L.R.A.N.S. 1062]; *Duckworth* v. *Watsonville etc. Co.*, 150 Cal. 520 [89 P. 338]; *Wutchumna Water Co.* v. *Pogue*, 151 Cal. 105 [90 P. 362]; *Huffner* v. *Sawday*, 153 Cal. 86 [94 P. 424]; *Miller* v. *Bay Cities Water Co.*, 157 Cal. 256 [107 P. 115, 27 L.R.A.N.S. 772]; *Walnut Irrigation Dist.* v. *Burke*, 158 Cal. 165 [110 P. 517]; *San Joaquin etc. Co.* v. *Fresno Flume Co.*, 158 Cal. 626 [112 P. 182, 35 L.R.A.N.S. 832]; *Miller & Lux Inc.* v. *Enterprise etc. Co.*, 169 Cal. 415 [147 P. 567]; *Miller & Lux Inc.* v. *J. G. James Co.*, 179 Cal. 689 [178 P. 716]; *San Bernardino* v. *City of Riverside*, 186 Cal. 7 [198 P. 784]; *Antioch* v. *Williams Irr. Dist.*, 188 Cal. 451 [205 P. 688]; *Oliver* v. *Robnett*, 190 Cal. 51 [210 P. 408]; *Pabst* v. *Finmand*, 190

Cal. 124 [211 P. 11] ; *Herminghaus* v. *Southern California Edison Co.*, 200 Cal. 81 [252 P. 607] ; *Fall River V. Irr. Dist.* v. *Mt. Shasta P. Corp.*, 202 Cal. 56 [259 P. 444, 56 A.L.R. 264] ; *Joerger* v. *Pacific Gas & Electric Co.*, 207 Cal. 8 [276 P. 1017] ; *Morgan* v. *Walker*, 217 Cal. 607 [20 P.2d 660] ; *Miller & Lux Inc.* v. *Tulare Lake etc. Dist.*, 219 Cal. 41 [25 P.2d 451] ; *Peabody* v. *City of Vallejo*, 2 Cal.2d 351 [40 P.2d 486] ; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.*, 3 Cal.2d 489 [45 P.2d 972, 1014] ; *Meridian, Ltd.* v. *San Francisco*, 13 Cal.2d 424 [90 P.2d 537, 91 P.2d 105] ; *Moore* v. *California Oregon Power Co.*, 22 Cal.2d 725 [140 P.2d 798] ; *Skelly* v. *Cowell*, 37 Cal.App. 215 [173 P. 609] ; *Stepp* v. *Williams*, 52 Cal.App. 237 [198 P. 661] ; *Mt. Shasta Power Corp.* v. *McArthur*, 109 Cal.App. 171 [292 P. 549] ; *California Pastoral & A. Co.* v. *Enterprise C. & L. Co.*, 127 F. 741. This court has never stated forthrightly that the above cases are overruled. There are expressions in some decisions to the effect that the doctrine of those cases is out of harmony with the concept embraced in the 1928 constitutional amendment, but the confusion resulting from such interpretation of this amendment was probably not envisioned by the members of this court who participated in the decisions in which this amendment was interpreted. Under this interpretation, one who diverts water for a nonriparian use can never acquire a right to the water diverted and beneficially used by him as against a riparian owner who does not see fit to use his share of the water of a stream to which his land is riparian. This means that many of the most valuable water rights in this state could not now be acquired. For example, A diverts water from a stream for a nonriparian use for the prescriptive period. During all this period there is water flowing past the lands of the riparian owners downstream who are not cultivating their land, and, therefore, have no present need for water. But after A has fully developed his nonriparian land by the use of water from the stream for the prescriptive period, the downstream riparian owners decide to develop their lands and need the water. Under the doctrine of the Gin Chow and Peabody cases, the downstream riparian owners are entitled to all of the water if they need it to the exclusion and detriment of the nonriparian owner who has made a beneficial use of it for the prescriptive period. This was not the law before these decisions.

I am convinced that the doctrine of *Lux* v. *Haggin supra*, did not establish a wise policy for the development of the

water resources of California, and had I been a member of this court when that case was decided, I would have joined with the dissenters. However, there were many salutary principles of water law which were engrafted onto that doctrine, under which valuable rights were established, and those principles should not be swept away by a stroke of the pen because the majority of this court believe that the 1928 constitutional amendment has modified the riparian right doctrine by limiting the right to the quantity of water reasonably necessary for the beneficial use of the riparian owner. This modification should not operate to prevent a nonriparian owner from acquiring the same character of right he could have acquired under the superseded doctrine. I take the position, therefore, that a prescriptive right may be acquired to so-called "surplus or excess water" and that a holding to the contrary fails to recognize fundamental and well settled principles of water law which were not abrogated by the 1928 constitutional amendment.

In this case we have overlying owners who are analogous to the riparian owners, and we have many different appropriators. These different persons have all been using the water for their various purposes for a great many years—far more years than is legally necessary to acquire a prescriptive right against anyone. The majority say they have been using adversely to each other, and have acquired prescriptive rights against each other. This is a statement with which I am not in accord. In order that one may gain a prescriptive right there must be an adverse user for the prescribed period of five years under such circumstances that the person against whom the use is adverse has knowledge, either actual or constructive. The majority charge the various appropriators with such knowledge because the water level in the wells was lowered. This is absurd. The level in these wells was, due to the very nature of the source of supply, subject to change. The duration and severity of the winter season, the length and intensity of the rainy season, the humidity or lack of humidity with its attendant lack of evaporation or evaporation would all have an effect on the supply of water available in the wells. The mere user of the water for the prescriptive period is not sufficient of itself to confer prescriptive title; the use must be adverse. Otherwise it can never ripen into a prescriptive title, no matter how long continued. And before a use can be adverse in the sense of this rule, it must be an invasion of the rights of the party against whom it is

set up, of such character as to afford him grounds of action; that is, it is the fact that the claimant has been exposed to an action which the opposite party has neglected to bring, that is seized on as the ground for presuming a grant in favor of long continued possession and enjoyment. The theory being that this adverse state of things would not have been submitted to if there had not been a grant. A general principle which has been applied is that a use of the water of a stream or lake by a common proprietor, although excessive, is not to be regarded as adverse, so as to ripen into a prescriptive right, however long continued, so long as it is the common use, and so long as other common owners are not injured thereby or prevented or excluded from making such use as of common right belong to them. (56 Am.Jur., Waters, pp. 766-768.)

In this case we have both overlying owners and appropriators using the water, and apparently all the water any of them had had need for. Yet we are asked to believe that each and every one of them has, in some way, gained a prescriptive right against each and every one of the others because the water level in the wells has been lowered. It appears from the report of the Water Commission that the underground supply has been withdrawn to a greater extent than is consistent with water conservation measures. It appears to me that the only question involved is that of priority in time of appropriation.

With respect to appropriators, the Civil Code provides that one prior in time is prior in right. (§ 1414.) This rule seems to be agreed upon by the text writers and a great number of cases. To state the general rule affirmatively, an appropriator of water is entitled, as against all subsequent claimants, to the exclusive use of the water to the extent of his appropriation, without diminution or material alteration in quantity or quality. The residue after a prior appropriation may be appropriated by others out of the water of the same stream, *if there is no interference with the prior appropriation.* When a senior appropriator does not need all or some portion of the water, a junior appropriator may, at such times, use such unused waters, although the rights of the senior appropriators, when fully exercised, consume the entire flow.

It is the very essence of the doctrine of prior appropriation that as between persons claiming water by appropriation, he has the best right who is first in time; in other words, the prior appropriator is entitled to it to the extent appropri-

ated to the exclusion of any subsequent appropriator for the same or any other use. But where both rights can be enjoyed without interference with or material impairment of each other, the enjoyment of both is allowed. (56 Am.Jur., Waters, pp. 758-9; Wiel, Water Rights in the Western States, p. 307 et seq.; *Wishon* v. *Globe Light & Power Co.*, 158 Cal. 137 [110 P. 290]; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.*, 3 Cal.2d 489 [45 P.2d 972, 1014]; *United States* v. *4,105 Acres of Land*, 68 F.Supp. 279; 121 A.L.R. 1044; Farnham, Waters and Water Rights, p. 2089; *City of Lodi* v. *East Bay Mun. Utility Dist.*, 7 Cal.2d 316 [60 P.2d 439]; *Larsen* v. *Apollonio*, 5 Cal.2d 440 [55 P.2d 196]; *Meridian, Ltd.* v. *San Francisco*, 13 Cal.2d 424 [90 P.2d 537, 91 P.2d 105].)

As a solution to the problem, the majority opinion affirms the trial court and in so doing holds that the appropriators, including appellant, shall have allocated among them the water shortage. This is to be done by a proportionate reduction of the amount each appropriator has heretofore been pumping. The majority cite no authority for this proposition. It is submitted that this is not, and should not be the law. In times of natural or other deficiency, also, unless otherwise provided by statute, the prior appropriator may still claim his full amount; the loss must fall on the later appropriators. (Wiel, Water Rights, *supra*, p. 311, and cases cited therein.) This follows naturally from the rule that prior in time is prior in right, and *this* rule is found in section 1414 of the Civil Code.

In *City of Lodi* v. *East Bay Mun. Utility Dist.*, 7 Cal.2d 316, 341 [60 P.2d 439], this court said: "The city is a prior appropriator and as such cannot be compelled to incur any material expense in order to accommodate the subsequent appropriator. (*Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist., supra*, p. 574.) Although the prior appropriator may be required to make minor changes in its method of appropriation in order to render available water for subsequent appropriators, *it cannot be compelled to make major changes or to incur substantial expense. (Peabody* v. *City of Vallejo, supra*, p. 376)." [Emphasis added.] It was also said at page 339, "Under such circumstances the 1928 constitutional amendment, as applied by this court in the cases cited, compels the trial court, before issuing a decree entailing such waste of water, to ascertain whether there exists a physical solution of the problem presented that will avoid the waste, and that will at the same time *not unreasonably and adversely*

*affect the prior appropriator's vested property right.''* [Emphasis added.]

The majority of this court, in holding that the prior appropriator's rights should be diminished proportionately with those of subsequent appropriators, is, in so doing, interfering with a vested property right, and comes squarely within the limitation on the police power of the state as set forth in the Fourteenth Amendment to the Constitution of the United States. The subsequent appropriators are charged with knowledge of the rights in the water acquired at a time prior to the time their rights were acquired, and it is they, rather than those who were first in time, whose rights should be subject to the exercise of the police power in the interests of the public in water conservation.

It is difficult to see how prescriptive rights can be said to have been gained by subsequent appropriators against prior appropriators without a determination of the extent of such rights. It seems that the scattered operations conducted by respondents should not have been lumped together to constitute one prescriptive right, but that there should have been a determination of each prescriptive right, if any, that respondent had acquired as against the appellant. Appellant sought, by its demurrer to the complaint, to have the court below require respondent to plead the exact quantities and locations of water rights which it claimed. Its demurrer was overruled. It sought to ascertain the same thing by a demand for a bill of particulars. The demand was denied.

The right to water acquired by prescription extends only to the quantity actually taken at the time the right matured and does not include the taking of an additional quantity in the future. (*Burris* v. *People's Ditch Co.,* 104 Cal. 248, 252 [37 P. 922] ; *North Fork Water Co.* v. *Edwards,* 121 Cal. 662, 665 [54 P. 69] ; *Southern Cal. Inv. Co.* v. *Wilshire,* 144 Cal. 68, 72 [77 P. 767] ; *Wutchumna Water Co.* v. *Ragle,* 148 Cal. 759, 765 [84 P. 162] ; *Pabst* v. *Finmand,* 190 Cal. 124, 132 [211 P. 11] ; *San Bernardino* v. *Riverside,* 186 Cal. 7, 25 [198 P. 784] ; *Tulare Irr. Dist.* v. *Lindsay-Strathmore Irr. Dist.,* 3 Cal.2d 489 [45 P.2d 972, 1014] ; *Elliott* v. *Bertsch,* 59 Cal.App.2d 543, 547 [139 P.2d 332].)

The majority opinion states that the trial court concluded that each party owned ''by prescription'' its ''present unadjusted right,'' that is, the amount which it had been actually pumping. To reach this result is to say that one may acquire a prescriptive right merely by *using* the water. As I have

pointed out previously, the use must be adverse, and the persons against whom the right is gained must have knowledge, either actual or constructive. (*City of San Diego* v. *Cuyamaca Water Co.*, 209 Cal. 105, 134 [287 P. 475].) Adverse use of water involves the invasion of the usufructuary right of another in a water supply common to both. Appropriative or prescriptive rights may be invaded only by interference by another resulting in actual diminution of the amount of water covered by such right. (*Faulkner* v. *Rondini*, 104 Cal. 140, 147 [37 P. 883]; *E. Clemens Horst Co.* v. *Tarr Min. Co.*, 174 Cal. 430, 440 [163 P. 492].)

Conceding that a restriction of the water supply was necessary, *and assuming for the purpose of argument only,* that the rules as to appropriation should not be applied, the restriction should have been based upon the elevations at appellant's wells rather than limiting it to a specific number of acre feet per year regardless of the status of the water tables.

Professor C. F. Tolman, Professor of Economic Geology at Stanford University, the leading authority on ground water, in his work "Ground Water" says: "It must not be concluded that a considerable lowering of the water table is serious or is detrimental to the water supply. Just as a surface reservoir must be drawn down in order to catch and preserve flood flow, so the subsurface-reservoir level (water table) must be lowered sufficiently to prevent loss by effluent seepage. A decrease in the area of effluent seepage increases the area of influent seepage (absorptive area) and in turn increases the rate of ground-water recharge. A depleted reservoir at the end of the dry season or cycle of dry years is necessary if the water is to be salvaged in the following wet season or cycle. In legal controversies an unreasonable view has been taken in the past in regard to the necessity of maintaining the water table at the 'natural level.'" (P. 469.) And at page 487: "Many of the underground reservoirs are so large that they have capacity to carry over great quantities of water not only from a wet season to the following dry season but also from a period of wet years to a period of dry years. However, to utilize these reservoirs fully it is necessary to pump enough water out of them to make room for all the inflow during the wettest seasons and during the periods of successive years of heavy precipitation. This was well illustrated by some of the underground reservoirs of Southern California, whose water tables, under heavy pumping for irrigation, went down a little lower each summer than they

had risen in the previous winter, until it appeared that excessive depletion must inevitably compel reduction in irrigagation. Then came a period of wet winters when recharge occurred to a remarkable extent and the water levels rose beyond all expectations.''

The language used by this court in *City of Lodi* v. *East Bay Mun. Utility Dist.*, 7 Cal.2d 316, 344 [60 P.2d 439] is applicable to the contention made by appellants: ''In our opinion the cause should be sent back to the trial court to permit it to take evidence as to the levels, to which plaintiff's wells may be lowered without substantial danger to the city's water supply. In fixing this danger level an adequate safety factor in favor of the city should be allowed. There is no necessity for a retrial of the case on the issues of fact as to which the court has made extensive findings, as above noted. The facts as thus found may be considered in connection with the further evidence taken to fix the danger level of Lodi's wells. The decree should then be reframed to provide that the duty rests upon the District to maintain the levels of the plaintiff's wells above the danger level so fixed by the trial court; that in the event the levels of the wells reach the danger points, the duty be cast upon the District to supply water to the city, or to raise the levels of the wells above the danger mark; and if the District does not comply with this order within a reasonable time, then the injunction decree already framed, or upon a proper showing as modified by the court under its continuing jurisdiction, shall go into effect. The trial court should by its judgment preserve its continuing jurisdiction, to change or modify its orders and decree as occasion may require.

''Such a decree would adequately meet the requirements of the Constitution by preventing an unreasonable waste of the waters of the stream and at the same time would adequately protect the prior rights of the City of Lodi. It would afford to the city a continuance of its water supply, the same, for all practical purposes, as if natural conditions were required to persist. If its wells go down to the danger level, it would immediately obtain water from the District at the latter's expense, or the injunction decree by means of which the underground levels will be artificially maintained would go into effect. It would accord to the District the right and place upon it the duty of working out a physical solution *unhampered by a rigid decree which, with changing conditions and new methods of conservation constantly being developed, may not operate inequitably but might actually en-*

*courage waste.* It would place upon the District the duty at its expense to maintain the underground water levels, and if the District fails to do so, or fails to supply water directly to the City of Lodi, the decree provides for compulsory releases so as to maintain natural conditions. Such a decree would say to the District: You should maintain the water levels so as not to cause substantial damage to the city, and you may do this in any way best suited to your needs, or if you do not maintain those levels you should supplement the city's supply to the extent of the deficiency caused by your operations by the furnishing of water by artificial means and at your expense. If you do not do these things you are subject to an injunction compelling releases to maintain natural conditions. Such a decree would undoubtedly prevent a multiplicity of suits. It would fix the rights of the prior appropriator and would determine the effect of the subsequent appropriator's diversions. Since there is no immediate danger to the prior appropriator, it would fix the danger levels of the prior appropriator's wells and when that level is reached, upon a showing to that effect, it would require the subsequent appropriator either by direct delivery of water or by compulsory releases to supply the prior appropriator's needs.

"Such a decree would permit the full use of all available waters, guarantee to the prior appropriator full protection, and would do this without unduly restraining the operations of the subsequent appropriator."

To accomplish the restriction by requiring appellant to maintain a certain level in its wells is a far more equitable solution than that proposed by the majority. In the first instance, during wet years he may, without court action, pump as much water as he has need for; in dry years, he will know exactly where he stands and that he may not go beyond the danger line. To place the restriction on the water-level basis will save time, money and expense.

The respondent seeks to answer appellant's contention as to the water-level basis of restriction with the argument that the decree was responsive to the pleadings "in that each claimed a certain amount of water and not that certain water levels should be maintained. As the Western Unit herein considered is an underground reservoir, the abstraction of an acre foot of water by one party is to that extent detrimental to the rights of every other party in the Unit." Of course the parties claimed a certain amount of water; appellant claimed,

and introduced evidence to support the claim, that, in accordance with the law, *a prior appropriator had a prior right*, but the decree is certainly *not* consistent with that claim.

In summary, the majority opinion seems to hold that ''surplus or excess water,'' without defining it, may be appropriated, but no prescriptive right may be acquired thereto; that a subsequent appropriator may acquire a prescriptive right against a prior appropriator of percolating water even though the prior appropriator has continued to divert and use his full appropriative right and has never been deprived of any portion of the quantity of water so appropriated by him; that an overlying owner may acquire a prescriptive right against another overlying owner who is using water from the same underground basin even though each has diverted and used the full quantity of water he could put to a beneficial use; that an overlying owner may acquire a right by prescription against a prior or subsequent appropriator and that the latter may acquire such a right against the former even though each has diverted and used the full quantity of water that he could reasonably put to beneficial use. Obviously, the effect of this holding is to place upon an equal footing users who have diverted and used a given quantity of water from an underground basin for a continuous period of five years regardless of the origin or period of time during which the diversions were made. This holding does not find support in a single authority or decision of any court in any common law jurisdiction since court decisions have been published. On the other hand, it is contrary to every decision which has ever been rendered by the courts of this state and every other jurisdiction which has considered the subject. Viewed in relation to the practical aspect of the case and the physical situation which must exist in every case of this character, the effect of this holding is to overrule every decision which has been rendered by this court in cases where similar factual situations existed. We must assume that, in a state of nature, the underground basin here involved was full of water in normal years of precipitation and runoff; that is, the water would be up to the top of the rim which confined it to the basin area. If all users from such a basin were overlying land owners, then under the settled rules of law as announced by this court, the rights of such users would be equal and correlative, and no user would have a prior or superior right to the other. (*San Bernardino* v. *Riverside,* 186 Cal. 7 [198 P. 784]; *Burr* v. *Maclay,* 154 Cal. 428, 439 [98 P. 260]; *Katz*

v. *Walkinshaw,* 141 Cal. 116 [70 P. 663, 74 P. 766, 99 Am.St. Rep. 35, 64 L.R.A. 236].) Then an appropriator comes into the picture. I mean by "appropriator," one who diverts and uses water on nonoverlying land. Obviously, the same rule does not apply to him as to an overlying owner because his use is clearly adverse to the latter, unless there is surplus or excess water in the basin, and this presents a most complex problem—one which it may take years to solve. Its solution depends upon many factors, such as topography, the area and depth of the basin, the quantity and source of supply, the outflow, if any, the character of use by the overlying owners, the type of crops raised, and various other factors which may not be immediately apparent. This court has held, and in my opinion correctly, that any appropriation made subsequent to the vesting of title in an overlying owner is adverse to such overlying owner and gives rise to an immediate cause of action on his behalf (*San Bernardino* v. *Riverside,* 186 Cal. 7 [198 P. 784]; *Burr* v. *Maclay Rancho Water Co.,* 154 Cal. 428, 439 [98 P. 260]; *Katz* v. *Walkinshaw,* 141 Cal. 116 [70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236]; *Miller* v. *Bay Cities Water Co.,* 157 Cal. 256 [107 P. 115, 27 L.R.A.N.S. 772]; *McClintock* v. *Hudson,* 141 Cal. 275, 281 [74 P. 849]; *Cohen* v. *LaCanada etc. Co.,* 142 Cal. 437 [76 P. 47]; *Montecito etc. Co.* v. *Santa Barbara,* 144 Cal. 578, 584 [77 P. 1113]; *Verdugo Canon Water Co.* v. *Verdugo,* 152 Cal. 655 [93 P. 1021]; *Hudson* v. *Dailey,* 156 Cal. 617 [105 P. 748]), because such use will necessarily ripen into a right by prescription against such overlying owner in five years. This is not true as between appropriators, as the rule always has been, as declared in section 1414 of the Civil Code, that "As between appropriators, the one first in time is first in right." (*Wishon* v. *Globe Light & Power Co.,* 158 Cal. 137 [110 P. 290]; *San Bernardino* v. *Riverside,* 186 Cal. 7 [198 P. 784]; *Meridian, Ltd.* v. *San Francisco,* 13 Cal.2d 424 [90 P.2d 537, 91 P.2d 105]; *Sherwood* v. *Wood,* 38 Cal.App. 745 [177 P. 491]; *Jones* v. *Pleasant Valley Canal Co.,* 44 Cal.App.2d 798 [113 P.2d 289].) Not only is the above cited section of the Civil Code completely abrogated and nullified, but all of the above cited cases are, in effect, overruled by the majority decision in this case.

The effect of the majority decision is to say to the overlying owners of land situated on an underground basin filled with percolating waters, that: "You have no cause of action against an appropriator of water for a non-overlying use unless you

can show that he is taking other than excess or surplus water, but if you do not commence an action to restrain such diversion, such an appropriator may obtain a prescriptive right against you if it should later be determined that he is taking water to which you and other overlying land owners may be entitled.'' Anyone who has the slightest knowledge of situations of this character should realize that this would place an impossible burden upon the overlying land owner and greatly jeopardize his rights. His difficulty would be multiplied if there were a number of overlying owners taking water from the same basin. Obviously, the overlying land owner should have an immediate cause of action against the appropriator, and the burden should be on the latter to show that he is taking only surplus or excess water or cease his diversion. So far as subsequent appropriators are concerned, the prior appropriator should have the right to rely upon section 1414 of the Civil Code and the above cited authorities which should vouchsafe to him a prior and superior right based upon his prior appropriation.

Since the decision of the trial court, which is affirmed by the majority decision of this court, is completely out of harmony with every statute, principle and rule of law which has heretofore been enacted and promulgated, I would reverse the judgment and remand the cause for a new trial in accordance with what should be the settled law of this state.

Appellant's petition for a rehearing was denied June 27, 1949. Carter, J., and Schauer, J., voted for a rehearing.